Georgia WHITE, etc.

v.

Joseph CALIFANO et al. and Richard Kneip et al.

No. CIV76–5031.

United States District Court, D. South Dakota.

Sept. 12, 1977.

Anita Remerowski, Terry Pechota, S. D. Legal Services, Mission, S. D., for plaintiff.

William Janklow, Atty. Gen., State of South Dakota, Pierre, S. D., David V. Vrooman, U. S. Atty., Sioux Falls, S. D., for defendants.

## MEMORANDUM OPINION

BOGUE, District Judge.

### I.

The allegations of Plaintiff and the procedural history of this case are set out in an earlier Memorandum Opinion of this Court. 420 F.Supp. 882. The parties have stipulated to the material facts and now seek a resolution of the controversy by means of a summary judgment.

Plaintiff has sued two groups of defendants; the first group consists of state and county officials and the second consists of federal officials. We will first consider the legal questions arising from the suit against the state officials ("state officials" hereinafter refers to both state and county officials).

### II.

Plaintiff and State Defendants have stipulated to the following facts:

1. Florence Red Dog is an indigent Indian member of the Oglala Sioux Tribe residing on the Pine Ridge Indian Reservation, Shannon County, South Dakota.

2. On April 13, 1976, J. W. Brantley, an Indian Health Service psychiatric social worker determined that Florence Red Dog was mentally ill and in such condition that immediate treatment was necessary for her protection from physical harm and for the protection of others.

3. On or about April 14, 1976, J. W. Brantley placed phone calls to Martin Farrell, Chairman of the Fall River County Board of Mental Illness and Roland Grosshans, state's attorney of Fall River County, informing them that he wanted to file a petition before the Fall River County Board of Mental Illness for the emergency commitment of Florence Red Dog to the Human Services Center. Brantley was informed by both Farrell and Grosshans that the Fall River County Board of Mental Illness had no jurisdiction over Florence Red Dog as she was an Indian residing on an Indian reservation. For this reason they refused to entertain, accept or act upon a petition by Brantley.

4. On April 15, 1976, Judge Steven Hawk, an Oglala Sioux Tribal Court Judge presided over a hearing without transcription on the necessity for the emergency commitment of Florence Red Dog to a mental hospital. That at that hearing the evidence presented to him consisted of the petition and verified affidavit of J. W. Brantley, a true and correct copy of which is attached and incorporated herein and the affidavit of Dr. John Rogers, a true and correct copy of which is attached and incorporated herein. That based on this evidence he found Florence Red Dog to be mentally ill and as a result thereof, to be of imminent danger to herself and others. That he then ordered Florence placed in the custody of Mr. J. W. Brantley, her psychiat-

ric social worker, for commitment to the Human Services Center. A true and correct copy of this order is attached and incorporated herein.

5. On April 15, 1976, preceding the hearing on Plaintiff's motion for temporary restraining order, Anita Remerowski (plaintiff's counsel) spoke with Roland Grosshans, State's Attorney for Fall River County and William Janklow, Attorney General of the State of South Dakota, informing them that the Oglala Sioux Tribal Court had authorized Florence Red Dog's transportation to the Human Services Center. They indicated Mr. Grosshans' position and that of the Board remained firm on the refusal to entertain a petition by Mr. Brantley.

6. That the policy of the Fall River County Board of Mental Illness and the Office of the Attorney General of the State of South Dakota is that the Fall River County Board of Mental Illness does not have the jurisdiction to entertain, accept or act upon petitions filed for the involuntary commitment to the South Dakota Human Services Center of Indian persons who are located within the boundaries of any Indian Reservation and within "Indian country" as defined by 18 U.S.C. § 1151, including the Pine Ridge Indian Reservation, and therefore, will not entertain, accept or act on such petitions. (Docket entry number 72, filed Oct. 4, 1976.)

### III.

Plaintiff's legal theory is that the refusal of state and county officials to commit Florence Red Dog to the Human Services Center in Yankton, South Dakota, violates her right to equal protection of the laws. The logic of her argument is compelling. ■ Florence Red Dog is a citizen of South Dakota, and as a citizen she can rely upon the equal protection clause of the fourteenth amendment to protect her from abuses or neglect by state officials even though she is an Indian person residing in Indian country. The equal protection clause provides that she has the right to vote in state and county elections. *Little Thunder v. State of South Dakota*, 518 F.2d 1253 (1975). A state court has held that an Indian person living on a reservation has an equal right to county welfare services.[1] *Acosta v. San Diego County*, 126 Cal.App.2d 455, 272 P.2d 92 (1954). Courts that have considered the issue have held that reservation Indians are entitled to the full use of state courts.[2] *E. g. State ex rel. Iron Bear v. District Court*, 162 Mont. 335, 512 P.2d 1292 (1973).

The South Dakota legislature has provided special protection for mentally ill persons. S.D.Comp.Laws Ann. 27A–7 (1967). Plaintiff contends that she is seeking this state protection for her mentally ill and indigent sister. Because state officials have refused to provide this protection on account of Florence Red Dog's race and place of residence, a violation of the equal protection clause is obvious, from Plaintiff's viewpoint, and state officials ought to be permanently enjoined from pursuing such a blatantly discriminatory policy.

State Defendants contend that Plaintiff's argument rests upon an erroneous assumption; namely, that the state officials have jurisdiction to provide the protection demanded for Florence Red Dog. The State Defendants' argument has internal consistency.

The argument begins with the premise that South Dakota has no criminal or civil jurisdiction over Indian persons residing in Indian country. *See* South Dakota Enabling Act, S.D.Comp.Laws Ann., Vol. 1 at 183 (1967); also *e. g. Annis v. Dewey County Bank*, 335 F.Supp. 133 (D.C.S.D.1971). South Dakota courts have no subject matter jurisdiction over civil suits that involve an Indian person and arise in Indian country. *Smith v. Temple*, 82 S.D. 650, 152 N.W.2d 547 (1967). The county sheriff can-

---

1. An equal protection analysis was not explicitly made in the *Acosta* case, but it appears to be the rationale implicit in the decision.

2. This is generally the law although *Smith v. Temple, infra,* seems to limit a court's subject matter jurisdiction to exclude cases involving Indians arising in Indian country.

not serve process in Indian country where Florence Red Dog resides. *Jordan v. O'Brien*, 70 S.D. 393, 18 N.W.2d 30 (1945).

State Defendants contend, therefore, that Plaintiff erroneously assumes that county officials can exercise their power where federal law clearly precludes such action. From this viewpoint, there can be no violation of the equal protection principle in this case because the demands made upon state officials could only be met if these officials acted beyond their legally defined powers by assuming jurisdiction over a civil matter having its origin in Indian country and involving an Indian person. From the viewpoint of State Defendants, an equal protection analysis cannot be reached in this case because federal law requires that Florence Red Dog be treated differently than other South Dakota citizens precisely because she is an Indian person residing in Indian country.

The issues appear to be as follows:

(1) Whether county and state officials have the power to order the involuntary commitment of an indigent, mentally-ill Indian person residing in Indian country to a state facility; and

(2) If said power exists, whether failure to make the commitment on account of race and residency within Indian country violates the equal protection clause of the fourteenth amendment.

### IV.

There was a time when jurisdiction was a territorial concept closely linked with the concept of sovereignty. Having jurisdiction meant having exclusive power over a defined geographical area. This territorial concept of jurisdiction lay at the heart of Chief Justice Marshall's views on the powers of states vis-a-vis the powers of the Indian nations. *Cherokee Nation v. Georgia*, 30 U.S. (5 pet.) 1, 8 L.Ed. 25 (1831); *Worchester v. Georgia*, 31 U.S. (6 pet.) 515, 8 L.Ed. 483 (1832). Indian nations were viewed as "dependent sovereignties" that existed in some instances within the boundaries of states of the Union but were free from the powers of any state.

If this territorial principle of jurisdiction were viable today, then the Pine Ridge Indian Reservation would be for all practical purposes a foreign state within the boundaries of South Dakota. We deem it to be clear, however, that the Marshallian view of the Indian tribes and their place in our federal system of government has yielded to social and political pressures of the last one-hundred fifty years. *Williams v. Lee*, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959). The territorial concept of jurisdiction has given way to a more flexible doctrine.

### V.

In *Williams v. Lee, supra*, the Supreme Court set a limit beyond which a state cannot constitutionally extend its powers in dealing with reservation Indians. *Williams* contains also implicitly a recognition that a state can extend its powers into Indian country to a limited degree. *Williams* is, therefore, a recognition of the fact that the territorial concept of jurisdiction is no longer viable. The Indian tribes have vestiges of sovereignty which must be guarded carefully, but reservations are not analogous to foreign states.

The recurring problem since *Williams* is to determine when and to what degree state power can penetrate Indian country. That is, in essence, the nature of the problem now before this Court. The resolution of this problem can only be accomplished by applying the test formulated in *Williams* and elaborated upon in cases following *Williams*. *See Organized Village of Kake v. Egan*, 369 U.S. 60, 82 S.Ct. 562, 7 L.Ed.2d 573 (1962); *Warren Trading Post Co. v. Arizona Tax Commission*, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965); *Kennerly v. District Court of Montana*, 400 U.S. 423, 91 S.Ct. 480, 27 L.Ed.2d 507 (1971); *McClanahan v. Arizona State Tax Comm.*, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (1973); and *Moe v. Confederated Salish and Kootenai Tribes of Flathead Reservation*, 425 U.S. 1634, 96 S.Ct. 1634, 48 L.Ed.2d 96 (1976).

■ Two concepts are present in the various formulations of the *Williams* test,[3] and these are as follows: (1) Indian sovereignty and (2) federal preemption. A state cannot extend its powers into Indian country if it will thereby infringe upon the right of the Indian people to govern themselves. Likewise, a state cannot exercise a power in Indian country if the federal government has preempted the particular field of activity over which the state attempts to extend its power. If an exercise of state power over an Indian person in Indian country can be accomplished without infringing upon the tribe's right to govern itself and without infringing upon an area of activity preempted by the federal government, then the exercise of state power is lawful.

## VI.

The issue of federal preemption will be dealt with in conjunction with an analysis of the federal defendants' responsibility toward plaintiff. Part XV, *infra*. At this time we will focus upon the concept of Indian sovereignty and try to relate that concept to the process of involuntary commitment of an allegedly mentally ill person. The particular question to be answered is whether or not the procedure of involuntary commitment and the fact of commitment itself are intrusions into Indian country (or into the life of a reservation person) to such a degree that rights of tribal self-government are necessarily infringed upon.

The laws of South Dakota pertaining to treatment for the mentally ill are contained in S.D.Comp.Laws Ann. 27A (1967). The procedure for involuntary commitment is contained in S.D.C.L. 27A–9; the procedure for emergency commitment of dangerously ill persons is contained in S.D.C.L. 27A–10. These chapters must be consulted in order to understand the nature of the intrusions into Indian country that are necessarily part of the involuntary commitment of a reservation Indian person.

■ The process of involuntary commitment is initiated by an application to the state's attorney for the county in which the allegedly mentally ill person resides.[4] The person applying to have another person committed must provide the state's attorney with necessary information about the person whom he seeks to have committed and must sign an affidavit verifying the matters reported. S.D.C.L. 27A–9–1. The state's attorney is required to put the information into a petition for commitment and is further required to submit that petition to the chairman of the county board of mental illness within seven days. S.D.C.L. 27A–9–5. (For composition of mental illness board *see* S.D.C.L. 27A–7–1.)

Within this initial seven-day period, from the time someone first contacts the state's attorney until the petition is submitted to the chairman of the mental illness board, the state's attorney must investigate the grounds upon which the application is based in order to ascertain whether or not there is probable cause to believe that the person who is the subject of the petition is indeed mentally ill. S.D.C.L. 27A–9–1. His findings must be reported to the chairman of the mental illness board in a written report submitted along with the petition. S.D.C.L. 27A–9–1. If the state's attorney finds probable cause, the chairman of the county board of mental illness must order that the county board convene for a hearing within seven days. S.D.C.L. 27A–9–5.

Certified copies of the petition and notice of the upcoming hearing must be personally served by the county sheriff on the alleged-

**3.** *See* M. Price, *Law and the American Indian*, at 201 (1973). Professor Price finds these two concepts evident in the *Williams-Kake-Warren* trilogy. *See also* Martone, *American Indian Tribal Self-Government in the Federal System: Inherent Right or Congressional License?* 51 Notre Dame Lawyer 600 (Apr.1976). Mr. Martone believes that preemption rather than tribal sovereignty "insulates the tribe from state law" but freely admits that many post-*Williams* decisions also use the sovereignty concept.

**4.** In this case the application was properly made to the state's attorney for Fall River County even though plaintiff was a resident of Shannon County. Shannon County is unorganized and is attached for administrative purposes to Fall River County. S.D.C.L. 7–17–1.

ly mentally ill person. S.D.C.L. 27A–9–6. If the subject of the petition fails to respond to the notice, the chairman of the county board of mental illness may issue a warrant and have the person who is alleged to be mentally ill detained pending a hearing and an examination. S.D.C.L. 27A–9–10.

If the board, after a hearing, has a doubt about the subject's mental condition, then temporary commitment can be ordered for more examinations and an opinion of the person's mental condition. S.D.C.L. 27A–9–16. If the board finds by clear and convincing evidence that the person under investigation is mentally ill and in need of treatment, the board has the power to commit that person to an institution for inpatient or outpatient care. S.D.C.L. 27A–9–18.

When it appears that a person is dangerously mentally ill, the commitment procedures are a bit more streamlined. Upon proper application under S.D.C.L. 27A–10–1, the chairman of a county board of mental illness may order apprehension and transportation to an appropriate facility. S.D.C.L. 27A–10–1. A person apprehended pursuant to this authority, however, must subsequently be given a hearing in accordance with the rules of S.D.C.L. 27A–9. *See* S.D.C.L. 27A–10–8.

### VII.

As the procedures heretofore outlined illustrate, the process of committing someone involuntarily brings the power of the state deep into the lives of the persons involved in the commitment process. The power of the state intrudes no less if the subject is an Indian person living in Indian country. The nature of that intrusion is critical.

To make a probable cause determination on the question of mental illness, the state's attorney must either venture into Indian country to interrogate the family and friends of the subject or attempt to call persons with an intimate knowledge of the subject's condition out of Indian country for interrogation. The sheriff's duties require that he personally serve a petition for com-

mitment and notice of a hearing on the Indian person residing in Indian country. If the subject does not appear for a hearing, the sheriff may again be required to travel into Indian country in order to apprehend and detain the Indian person.

These intrusions are illustrative but by no means exhaustive. What they illustrate is this: applying the procedures of an involuntary commitment to an Indian person in Indian country would require severe intrusions into the tribe's vestigial sovereignty; moreover, county officials would be required to make these intrusions in order to meet the demands of plaintiff in this case.

In addition to the procedure for commitment and the accompanying penetration of state power, the fact of commitment itself must not be forgotten. Although an involuntary commitment is made to meet a grave human need (as well as to protect society from antisocial conduct), and is in no way intended as an act of punishment, the loss of freedom is analogous to that brought about through the application of the criminal law. A person involuntarily committed is torn away from family, friends and community; after commitment the person may be allowed no greater liberty than a person convicted of a criminal offense. One can scarcely conceive how the power of the state could be brought to bear upon a person with any greater severity.

To reconcile these intrusions with the idea of there being a barrier between the state and Indian country appears to be impossible. In *Williams v. Lee, supra,* it was held that non-Indians could not sue reservation Indians in state courts when the transaction giving rise to the controversy occurred in Indian country. The Supreme Court stated:

> There can be no doubt that to allow the exercise of state jurisdiction here would undermine the authority of the tribal courts over reservation affairs and hence would infringe on the right of Indians to govern themselves. 358 U.S. at 223, 79 S.Ct. at 272

550

In *McClanahan v. State Tax Commission of Arizona, supra,* the Supreme Court used the idea of sovereignty from *Williams v. Lee* "[as] a backdrop against which applicable treaties and federal statutes must be read" and held that Arizona could not impose a personal income tax on a reservation Indian whose income was derived from reservation sources. Finally, in *Moe v. Confederated Salish and Kootenai Tribes, supra,* it was decided that Montana could neither tax personal property of Indians located on the reservation, nor require a reservation Indian conducting a cigarette business to pay a vendor license fee, nor impose a cigarette sales tax on sales by Indians to Indians on the reservation. As in *McClanahan,* the rule enunciated was that absent specific authority from Congress, a state has no taxing power over Indian persons in Indian country. Power over Indian persons in Indian country cannot be assumed as an inherent power of a state as that would breach the barrier recognized in *Williams v. Lee* as a vestige of tribal sovereignty.

If the collection of taxes of any sort from Indian people in Indian country, or the power to coerce them to come into state courts as defendants in civil actions would necessarily infringe upon tribal sovereignty, then there is no way that vesting the state with the power to involuntarily commit reservation Indian persons to state institutions would not violate that same sovereignty. This Court therefore concludes, on the basis of *Williams v. Lee* and its progeny, that the state and county defendants in this case have no power to initiate or carry out the procedures for the Involuntary commitment of an allegedly mentally ill Indian person who resides in Indian country. The concept of tribal sovereignty, diluted though it may be, cannot coexist with the process and act of involuntary commitment by the power of the state under the circumstances presented in this case.

## VIII.

Plaintiff argues that the jurisdictional issue posed by state defendants is a "red herring." By reading her pleadings, it becomes clear that she recognizes the reality of jurisdictional questions presented, but believes that any difficulties could easily be surmounted by cooperation between state and tribal officials. What is envisioned, apparently, is a cooperative endeavor whereby tribal officials would first take jurisdiction over the person and subject matter when a case appearing to necessitate involuntary commitment arises; thereafter, a person would be transferred to the custody of state officials if commitment were necessary.

Initial fact-finding would be done (as in this case) by the tribal court. State officials could either act upon the tribal court's findings or give a *de novo* hearing to determine the mental state of the person being considered. Appealing as it seems, we simply cannot reconcile this idea with what appears to be the law as to state jurisdiction over Indian country. The irreconcilability of plaintiff's theory with the law on jurisdiction stems from the two main problems heretofore outlined; namely, the intrusions involved in the process of involuntary commitment and fact of involuntary commitment itself. The procedures of involuntary commitment are not only requirements of South Dakota statutory law, but are for the most part, requirements of the due process clause of the federal Constitution. *See Sebastian v. United States,* 531 F.2d 900 (1976) and the authorities cited therein. To require South Dakota to construct commitment procedures that were less of an intrusion into Indian country would make no sense; less intrusion would, to a corresponding degree, mean a short-circuiting of due process. In order to act in a manner consistent with due process (to provide what plaintiff demands under equal protection), the state would have to intrude to a significant degree into reservation affairs; and that intrusion we have found to be unlawful. Thus, we can conceive of no way that the state can lawfully give a *de novo* review of a tribal commitment proceeding.

That leaves only the possibility of the tribe handling the commitment proce-

dure and the state simply accepting for commitment whomever the tribe provides. There would be a transfer from tribal to state jurisdiction after tribal officials had made the determination that involuntary commitment was in order; there would be a point where the state would be vested with jurisdiction with tribal consent. We conclude that this alternative is also impossible under the present state of the law as evidenced by the Supreme Court's ruling in *Kennerly v. District Court of Montana, supra.*

In *Kennerly* the question presented to the Supreme Court was whether or not the unilateral action of the Blackfeet Tribal Council was adequate to vest Montana courts with jurisdiction over civil matters which arose on the reservation and involved an Indian. The answer of the Supreme Court is unambiguous. The Indian Civil Rights Act of 1968 "substituted a new regulatory scheme for the extension of state civil and criminal jurisdiction to litigation involving Indians arising in Indian country." 91 S.Ct. at 482. A state can take jurisdiction over civil matters arising in Indian country, but it can only be done with tribal consent, and "the tribal consent that is prerequisite to the assumption of state jurisdiction . . . must be manifested by majority vote of the enrolled Indians within the affected area of Indian country." 91 S.Ct. at 483. If the tribal council of the Blackfeet Tribe does not have the power to transfer jurisdiction over civil suits to the Montana state courts, then it appears to us that the Oglala Sioux Tribal Court has no power to transfer jurisdiction over the subject matter (and person) in an involuntary commitment proceeding to state officials.

The jurisdictional issue is more than a "red herring." We believe that lack of jurisdiction precludes the action demanded by plaintiff. The equal protection issue itself cannot be reached.

**5.** The Plaintiff and federal defendants have framed several issues; we refrain from deciding them because the resolution of the central

## IX.

The suit between plaintiff and the federal defendants does not involve a jurisdictional issue. The question presented, as phrased by agreement in a stipulation, is as follows: Whether Federal Defendants have a duty under statute and/or regulation to provide directly or by contract for inpatient mental health care to reservation Indians who require involuntary civil commitment for treatment or who because of mental illness constitute a serious danger to themselves and/or others and, therefore, require physical restraint in a secured treatment setting.[5] (Docket entry 165 at 10.)

As with plaintiff and state defendants, plaintiff and the federal defendants have stipulated as to the relevant facts. (Docket entry 165.) That stipulation is hereby incorporated by reference, and there will be no need to set it out in its entirety in this opinion. A portion of that stipulation is, however, of particular interest to the Court and is set out in the following excerpt:

*History of United States Involvement in Providing Mental Health Care to Indians*

"United States," as used in this stipulation, means all agencies of the United States Government, including but not limited to the Indian Health Service, the Bureau of Indian Affairs, St. Elizabeth's Hospital in the District of Columbia, the Veterans Administration, and the Armed Services.

"Some inpatient mental health treatment" refers to a range of mental health treatment. At times it has included the type of inpatient care or facilities necessary to treat a person who, like Florence Red Dog, is a serious danger to herself or others and therefore requires physical restraint in a secured treatment setting, or who requires involuntary civil commitment.

13. Some inpatient mental health treatment for Indian persons from reservations in South Dakota has in the past been provided by the State of South Dakota and the United States.

issue as to duty will determine the outcome of the lawsuit.

14. Prior to 1955, the United States provided some inpatient mental health care directly and by contract.

15. Between 1955 and 1973, IHS[6] contracted with state and private facilities for some inpatient care and provided some inpatient care directly in IHS facilities. The last contract with South Dakota expired as of July, 1971.

16. Subsequent to July, 1971, up to and including the present time, IHS has provided some inpatient care either directly in federal facilities or by contracting with various private facilities.

### Care Presently Available from IHS Facilities

17. In 1976 and at the present time, IHS provides treatment for a number of serious physical ailments, for a number of minor physical ailments, and also provides preventive medicine to reservation Indians.

18. All IHS hospitals treat some mental health conditions, including some voluntary patients who do not require civil commitment or physical restraint in a secured treatment setting.

19. The Indian Health Service has no mental hospital as such and no mental wards at Pine Ridge or in South Dakota.

20. The Indian Health Service did not in April, 1976, and does not at the present time, provide inpatient mental health care to persons who required civil commitment or who because of mental illness constituted a serious danger to themselves or others and, therefore, required physical restraint and a secured treatment setting.

21. In Alaska and New Mexico, where there are also state mental hospitals, IHS operates a hospital mental health ward and provides inpatient mental health treatment for some types of mental illness, including treatment of some voluntary patients who do not require civil commitment and who do not require restraint in a secured treatment setting.

22. The Indian Health Service has patient care monies which can be used for the hospitalization of a patient for a psychiatric disorder. IHS fully expends this fund each year, primarily for non-psychiatric medical services.

### History of the Indian Health Service and South Dakota Relationship Relating to Provision of Inpatient Mental Health Care to Indians

23. Neither the State of South Dakota nor the United States has ever provided for the total need for inpatient mental health care for Indians on Indian reservations.

24. The Human Services Center at Yankton, South Dakota, can provide treatment to persons who need civil commitment for treatment or who because of mental illness constitute a serious danger to themselves or others and who require a secured treatment setting.

25. Florence Red Dog had been assisted by IHS in obtaining treatment at the Human Services Center in Yankton, South Dakota, prior to April, 1976.

26. The policy of IHS with respect to inpatient mental health treatment is that alternative state resources will be relied on in the allocation of IHS resources. This policy was followed in every state.

27. South Dakota was notified of IHS's intent to rely on State mental hospitals in 1970.

28. Since 1971, IHS has refused to pay the full cost of care but offered in 1971 to pay the State of South Dakota the going county indigent rate of $50 per month.

29. Subsequent to July, 1971, South Dakota provided some inpatient mental health care but continued to bill IHS for the full cost of care.

We further note that plaintiff and federal defendants have stipulated that plaintiff's exhibits A through V are authentic and accurate; by virtue of that stipulation these exhibits are made part of the record in this case.

6. Indian Health Service.

## X.

Congressional interest in the health of native Americans developed slowly. *See* Cohen, *Handbook of Federal Indian Law,* p. 243. Prior to 1849, some federal health services to Indians were provided by military personnel; also, some funds for medical care were provided pursuant to treaties. Services were not available on a regular basis. A primary objective of federal officials was to combat epidemics of contagious diseases. As early as 1832 Congress authorized the War Department to provide vaccinations against smallpox for the Indians.

In 1849, when the Bureau of Indian Affairs (hereinafter B.I.A.) was transferred from the War Department to the newly-created Department of the Interior, the federal policy toward Indian health needs came under complete civilian control. Expenditures were random, generally meagre. For the most part, health needs were met from "miscellaneous" appropriations.

In 1921, the Congress passed the Snyder Act which specifically authorized the B.I.A. to spend money on the Indian people "for relief of distress and conservation of health." 25 U.S.C. § 13. Under this act funds were appropriated specifically for health services to Indians. In 1934, Congress specifically authorized the Secretary of the Interior to contract with states, political subdivisions of states, private and public institutions, etc. in order to provide, *inter alia,* medical attention to Indians. 25 U.S.C. § 452. In 1947 Congress further expanded the options open to B.I.A. officials by authorizing the Secretary of Health, Education and Welfare (hereinafter H.E.W.) to accept Indians for care and treatment at Saint Elizabeth's Hospital in Washington, D. C. With the passage of the Transfer Act, the responsibility for meeting Indian health needs was transferred in 1955 from the B.I.A., under the Secretary of the Interior, to the new Division of Indian Health in the Public Health Service under the supervision of the Surgeon General. 42 U.S.C. § 2001. In 1968 the Division of Indian Health was renamed the Indian Health Service (hereinafter I.H.S.). The office of Surgeon General has since been abolished, but the Indian Health Service remains in H.E.W. The Indian Health Service is one division of the Public Health Service, and is the agency through which Congress provides health services to Indians.

## XI.

From the stipulation quoted, *supra,* and from plaintiff's exhibit Q, it appears that the origin of this present controversy lies in a decision made in 1971 by legal counsel for H.E.W. The Director of I.H.S. was advised that Indian people had access to all state facilities on the same basis as all other state citizens. Acting upon that advice, the I.H.S. Director for the Aberdeen Area (whose jurisdiction includes Pine Ridge) initiated a policy that would result in the eventual termination of contracts by which I.H.S. purchased services from the state for Indian people.[7] Federal officials, in effect, decided to become "residual" suppliers of certain health services; particularly, they decided to leave it to South Dakota to provide inpatient treatment for persons such as Florence Red Dog.

Plaintiff's position is that the decision to become a "residual" supplier of services is incompatible with the federal government's trust responsibility and with statutes and regulations pertaining to Indian health care. Plaintiff admits that no statute states with specificity that the I.H.S. must provide care for persons requiring involuntary commitment, but she does argue that such a duty is implicit in the unique legal relationship that exists between the Indian tribes and the federal government. She further argues that Congress has been led to believe that I.H.S. is a *primary* supplier of services, and that services provided are *comprehensive*; hence, I.H.S. officials (according to plaintiff) have themselves repre-

---

7. Apparently the I.H.S. was willing, after the policy change, to pay South Dakota the rate that counties would pay for indigents commit-

ted to the Human Services Center—$50 per month. *See* stipulation 28, *supra.*

sented to Congress that a person in the position of Florence Red Dog would be cared for by I.H.S. Thus, the present "gap" in services is not, following plaintiff's argument, the intent of Congress but rather a tragic failure on the part of I.H.S. to properly ascertain and comply with congressional intent.

Federal defendants argue that their funds are limited and that they are trying to spend them in the best manner possible. Their position is that the decision not to treat Florence Red Dog is within their discretion, i. e. the Court has no business substituting its judgment for the judgment of agency officials. Ultimately, they rest on the assertion that, whatever federal responsibilities might be, they are not to be guessed at by reference to the vague idea of "trust responsibility." Duty, if any can only be found by reference to specific statutes. Finding no statute that specifically creates a duty for I.H.S. to care for persons in the class of Florence Red Dog, federal defendants deny that there is such a duty.

## XII.

Defining the dimensions of the trust relationship between Indians and the federal government as that relationship has evolved could consume much time and labor, and we are doubtful that probing history can give us more than a framework within which to analyze the present issue. Our attention will focus, therefore, upon the latest statements of Congress about the subject of health care for Indians. After the commencement of this lawsuit the Congress passed and the former president signed Public Law 94–437 now codified as 25 U.S.C. § 1601, *et. seq.* We think that statute embodies the most relevant legislative material available for ascertaining the intent of Congress on the subject of federal responsibility toward Indians' health needs, and is the latest statement of what the trust responsibility requires in the area of health care.

In section 2 of P.L. 94–437 (25 U.S.C. § 1601) the Congress stated:

The Congress finds that—

(a) Federal health services to maintain and improve the health of the Indians *are consonant with and required by the Federal Government's historical and unique legal relationship* with, and resulting responsibility to, the American Indian people. (Emphasis ours.)

(b) A major national goal of the United States is to provide the quantity and quality of health services which will permit the health status of Indians to be raised to the highest possible level and to encourage the maximum participation of Indians in the planning and management of those services.

In Section 3 of P.L. 94–437 (25 U.S.C. § 1602) Congress declared:

The Congress hereby declares that it is the policy of this Nation, in fulfillment of its special responsibilities and legal obligations to the American Indian people, to meet the national goal of providing the highest possible health status to Indians and to provide existing Indian health services with all resources necessary to effect that policy.

The Congress went on in Title II of this Indian Health Care Act (P.L. 94–437, *et seq.*, and 25 U.S.C. § 1621, *et seq.*) to *authorize* certain appropriations for health services to Indians. Section 201(c) (25 U.S.C. § 1621(c) ) states in relevant part:

The following amounts and positions are authorized . . . for the specific purposes noted: . . .

(4) Mental health: (A) Community mental health services: sums and positions as provided in subsection (e) of this section for fiscal year 1978, $1,300,000 and thirty positions for fiscal year 1979, and $2,000,000 and thirty positions for fiscal year 1980.

(B) Inpatient mental health services: sums and positions as provided in subsection (e) of this section for fiscal year 1978, $400,000 and fifteen positions for fiscal year 1979, and $600,000 and fifteen positions for fiscal year 1980.

(C) Model dormitory mental health services: sums and positions as provided in subsection (e) of this section for fiscal year 1978, $1,250,000 and fifty positions for fiscal year 1979, and $1,875,000 and fifty positions for fiscal year 1980.

(D) Therapeutic and residential treatment centers: sums and positions as provided in subsection (e) of this section for fiscal year 1978, $300,000 and ten positions for fiscal year 1979, and $400,000 and five positions for fiscal year 1980.

(E) Training of traditional Indian practitioners in mental health: sums as provided in subsection (e) of this section for fiscal year 1978, $150,000 for fiscal year 1979, and $200,000 for fiscal year 1980.

Finally, subsection (e) authorizes $10,025,000 and 425 positions for 1978. We must decide whether or not the position of I.H.S. officials is consistent with the intent of Congress.[8]

### XIII.

■ This Court is of the opinion that there is no rational way to reconcile the federal defendants' position with the Congress's declaration of policy. We think that Congress has unambiguously declared that the federal government has a legal responsibility to provide health care to Indians. This stems from the "unique relationship" between Indians and the federal government, a relationship that is reflected in hundreds of cases and is further made obvious by the fact that one bulging volume of the U. S. Code pertains only to Indians.

It matters not at this juncture whether the federal government is called a residual supplier or a primary supplier of services.

We determined earlier in this opinion that the State of South Dakota has no jurisdiction to involuntarily commit Florence Red Dog. The question then became, not whether the federal defendants are residual or primary suppliers, but whether they can abandon Florence Red Dog entirely. We hold here that they cannot abandon her if she requires involuntary commitment. The federal defendants are free to call themselves "residual suppliers" if that fits in better with their policy statements, but where the state cannot act, they must. The rationale for this holding is the declaration of policy by Congress cited, *supra.* This, we believe, defines with adequate specificity what the trust relationship requires of the I.H.S. in this situation involving Florence Red Dog.

We are not unmindful of the fact that this is no simple matter for I.H.S. officials. The I.H.S. staff on the Pine Ridge Reservation does not presently have adequate facilities or manpower to treat Florence Red Dog and other similarly situated persons; moreover, they cannot create programs out of the bald statements of Congress but must work with the funds Congress appropriates. Courts have no expertise for deciding how limited resources should be allocated. For guidance, this Court has turned to *Morton v. Ruiz,* 415 U.S. 199, 94 S.Ct. 1055, 39 L.Ed.2d 270 (1974).

In that case the Supreme Court of the United States decided that the B.I.A. owed a duty by statute to provide benefits under its general assistance program not only to Indians living on reservations but also to certain unassimilated Indians living near reservations. The Secretary of Interior protested that funds were inadequate to

---

8. This Court granted temporary injunctive relief when the lawsuit was commenced. Florence Red Dog was subsequently released from the State Human Services Center. At a later time, she was committed from Pennington County on an emergency basis and at the time of this Opinion is still in the Human Services Center. Injunctive relief is not needed, and for the reasons stated, *infra,* the damage claim will be dismissed. This Court deems it proper under the circumstances, however, to consider declaratory relief. To grant relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, there must, of course, be a live case or controversy. Rights can only be declared with respect to facts that exist at the time of the Court's decision on the merits, not with reference to facts as they existed at the time the suit was commenced. *Golden v. Zwickler,* 394 U.S. 103, 89 S.Ct. 956, 22 L.Ed.2d 113 (1969). Likewise, we believe the law at the time of the decision on the merits is controlling. This case, therefore, will be decided with some reliance upon the Indian Health Care Improvement Act of 1976 even though this legislation was enacted after the suit was commenced.

carry out that task. The Court, acknowledging the difficulty, simply stated that B.I.A. officials must, if necessary, readjust their eligibility criteria. This Court can only follow the Supreme Court's suggestion in *Morton v. Ruiz.*

The I.H.S. cannot meet *all* health needs of all Indian people with X dollars. The mere fact that resources are not unlimited means that some choices must be made; *i. e.* I.H.S. officials must exercise discretion. In exercising that discretion, however, I.H.S. officials are bound by agency regulations which, as a product of agency rule-making power, have the force of law.

The applicable regulations were promulgated in 1956; they are codified in 42 C.F.R. § 36.12(c) which reads:

> *Priorities when funds, facilities, or personnel are insufficient to provide the indicated volume of services.* Priorities for care and treatment, as among individuals who are within the scope of the program, will be determined on the basis of relative medical need and access to other arrangements for obtaining the necessary care.

42 C.F.R. § 36.1(a), concerning the scope of these regulations, states:

> The regulations in this part establish the general principles to be followed in the discharge of this Department's responsibilities for continuation and improvement of Indian health services. Officers and employees of the Department will be guided by these policies in exercising discretionary authority with respect to the matters covered.

Florence Red Dog's medical need was extreme when the suit began. (Her condition is such that she requires inpatient care more than a year later.) No reasonable person could take the position that her "relative medical need" was less than urgent when she was confined, prior to this Court's temporary restraining order, to the Pine Ridge jail. Statements of I.H.S. officials have substantiated that an urgent need for constraint and treatment existed.

The discretion of I.H.S. officials was based upon their assumption that Florence Red Dog had "access to other arrangements for obtaining medical care." The earlier part of this opinion has, of course, destroyed the assumption upon which agency action was based. Thus at this time, all this Court will require is that the I.H.S. conform their policy to 42 C.F.R. § 36.12(c); the standard set therein cannot be superseded or replaced by *ad hoc* internal policy-making decisions.

We fully realize that the authorizations of the 1976 act are *not* appropriations. We note, however, that the federal defendants have stipulated that funds which can be used for hospitalization of a patient for a psychiatric disorder are expended each year, primarily for non-psychiatric medical services. *See* Stipulation 22, *supra.*

As to the allowable means for providing care, it makes no difference whether federal officials contract with state or private agencies or make commitments to federal facilities. In either case, commitment procedures that conform to the requirements of due process will have to be developed. What role, if any, the tribal court or tribal officials have in commitment procedures is of no concern here.

## XIV.

As stated earlier, the basis for the conclusion that federal defendants have a duty in the present case is the latest statement of Congress on the trust responsibility of the federal government in relation to Indian tribes in the area of health services. Federal defendants, in their briefing, have taken a very dim view of the idea that something as abstract as trust responsibility could compel them to act under the circumstances of this case.

Federal defendants' argument is that the trust responsibility, standing alone, cannot serve as an adequate legal basis for the relief sought by plaintiff; in support of that argument they cite *Donahue v. Butz,* D.C., 363 F.Supp. 1316 (1973); *Gila River Pima-Maricopa Indian Community v. United States,* 427 F.2d 1194, 1198, 190 Ct.Cl. 790 (1970); and *Sac and Fox Tribe v. Unit-*

*ed States*, 383 F.2d 991, 179 Ct.Cl. 8 (1967). In *Donahue v. Butz* a district court held that federal officials could not be compelled on the basis of the trust responsibility alone to create a reservation from United States public lands; in the *Gila River Pima-Maricopa Indian Comm.* case, the United States Court of Claims simply held that the "fair and honorable dealings" section of the Indian Claims Commission Act did not, absent some other indication of duty, require that the United States provide, *inter alia*, a higher level of medical care; and finally, in the *Sac and Fox Tribe* case, the Court of Claims rejected the idea that a "constructive trust" ought be imposed (as in cases of fraud) when the United States was a party to land sales that resulted in allegedly unconscionable consideration for Indians. None of these cases conflicts with our holding in this case.

If Congress had at some point in history stated that a trust responsibility existed, and never said more, then in the absence of controlling precedent this Court would scarcely be able to conclude that care for Florence Red Dog was included within the federal government's trust responsibility. But, the Congress has taken the well-accepted concept of trust responsibility [9] and has said a great deal about what it means; in particular, the Congress in 1976 stated that the federal government had a responsibility to provide health care for Indians. Therefore, when we say that the trust responsibility requires a certain course of action, we do not refer to a relationship that exists only in the abstract but rather to a congressionally recognized duty to provide services for a particular category of human needs. The trust responsibility, as recognized and defined by statute, is the ground upon which federal defendants' duties rest in this case.

This is not to be misconstrued as an assertion that every dealing between the federal government and an Indian person ought to be understood with reference to the trust relationship. For example, if an Indian person serves in the armed forces and accrues rights to benefits provided for by statute, then he will receive benefits as a statutory entitlement along with other persons who have accrued the same rights. The relationship in this example would have nothing whatever to do with trust responsibility; it is defined solely by statute (or judicial construction of the statute) and the Indian person has only the right to be treated as others similarly situated.

When the Congress legislates for Indians only, something more than a statutory entitlement is involved. Congress is acting upon the premise that a special relationship is involved, and is acting to meet the obligations inherent in that relationship. If that were not the case, then most of 25 U.S.C. could not withstand an equal protection analysis for the reason that the legislation embodied in that volume is aimed at a class defined on the basis of race. We have, therefore, read and construed the Indian Health Care Improvement Act as a manifestation of what Congress thinks the trust responsibility requires of federal officials, with whatever funds are available, when they try to meet Indian health needs.

Our reliance upon the 1976 legislation is not to be taken as an indication that this Court believes that federal defendants had no responsibility for Florence Red Dog prior to that act. Plaintiff has made a compelling argument that the duty existed under the Snyder Act. She has provided certain exhibits from which it could easily be concluded that representations to congressmen about I.H.S. activities were not totally in harmony with I.H.S. policy decisions about being "residual" suppliers. Repeatedly, I.H.S. *was* represented as an agency that had *primary* responsibility to provide *comprehensive* health services.[10] Plaintiff, using the strategy that was so successful in *Morton v. Ruiz, supra*, would therefore have us find that Congress, in each appropriation over the past several years, intended that the needs of persons such as Florence Red Dog be met.

**9.** We assume that "unique legal relationship" is roughly equivalent to "trust responsibility."

**10.** See Plaintiff's Exhibits A–J, and Plaintiff's Exhibit O.

That argument may have merit. We do not reject it; we simply defer to the 1976 legislation which appears to be on point. We will state, however, that it is difficult to conceive how Congress could appropriate *any* money specifically for health care for Indians and intend to ignore the most wretched human condition requiring health care, *i. e.* insanity. What is more conceivable is that congressmen, not being aware of the jurisdictional dispute preceding this lawsuit, assumed that state officials could act and that, where necessary, federal officials would act. This situation arose, it appears, not from apathy or bad faith but from the uncertain state of the law and the harsh fact that everybody's resources are finite.

## XV.

■■■ Having established that state defendants have no power to involuntarily commit an Indian person residing in Indian country, and having further established that federal defendants have a responsibility to care for the plaintiff, it is now time to reflect upon the question which we earlier reserved for consideration; namely, whether the federal government has preempted this area of activity. The answer to the question will determine whether the holding concerning South Dakota's lack of jurisdiction in the present case rests upon a single rationale (tribal sovereignty) or a dual rationale (tribal sovereignty and preemption).

It may seem singularly inappropriate to speak in terms of possible "federal preemption" when federal defendants have vigorously fought to pass responsibility off onto the State. Furthermore, the area of social services is not typically an area of activity in which the preemption theme is raised. Typically, preemption arguments are raised when federal regulatory activity conflicts with a state's attempts to regulate a given area of activity; hence, the term "preemption" itself may be inappropriate in this discussion. But, even if the term is momentarily cast aside, there is an issue here that needs some examination. The issue is

whether the Congress, by limiting the state's powers and by recognizing a unique relationship and resulting responsibility to the Indian people, has in this case acted to relieve the state of a responsibility otherwise owed by statute to its citizens.

In appendix A we have traced the history of South Dakota's relationship with the federal government in the limited area of jurisdiction over Indian country. It is readily apparent that South Dakota came into the union on the condition that Congress would retain absolute jurisdiction and control over Indian country. Since statehood, Congress has twice made provisions whereby the people of the state could, if they chose, alter that arrangement.

Each attempt to get the state to take jurisdiction over Indian country pursuant to Public Law 280 (67 Stat. 588) was thwarted because the people of the state were unable to secure from federal officials any pledge to alleviate the financial stress that would be placed on county governments by an assumption of responsibilities without a corresponding increase in tax base. Since the passage of the Indian Civil Rights Act, no serious attempts have been made to transfer jurisdiction to the state. Thus the agreement between the state and federal governments as to jurisdiction has never (in theory at least) been altered since the time South Dakota gained statehood.

The state has then, in theory, never had jurisdiction over Indian country. As we have pointed out earlier, that general statement is subject to exceptions; nevertheless the theory has led to the following conclusions, among others, during the evolution of the state/federal relationship: (1) the state cannot tax lands held in a trust status, *United States v. Rickert*, 188 U.S. 432, 23 S.Ct. 478, 47 L.Ed. 532 (1903); (2) the state cannot tax Indians' personal property held on the reservation, *Dewey County of South Dakota v. United States*, 26 F.2d 434 (8th Cir. 1928); *Pourier v. Board of County Commissioners of Shannon County*, 83 S.D. 235, 157 N.W.2d 532 (1968); (3) the state cannot require that Indians living on a reservation pay a licensing fee on mobile

homes, *Whirlwind Soldier v. Carlson*, 350 F.Supp. 65 (D.C.S.D.1972); and (4) the state has no power to enforce the collection of an unemployment tax. *Employment Security Department v. Cheyenne River Sioux Tribe*, 80 S.D. 79, 119 N.W.2d 285 (1963). Of course, it is also understood by anyone reasonably familiar with Indian law that jurisdiction over major crimes involving an Indian lies with the federal government; jurisdiction over lesser crimes involving an Indian lies with the tribe.

This discussion of powers that the state *lacks* could be expanded into a treatise, but no purpose would be served. The point is that as a condition of statehood, South Dakota was stripped of the most fundamental powers of government over Indian country; that remains the situation today. Perhaps it ought to be called "relinquishment" rather than "preemption" as the state agreed to yield; yet, the fact is clear that South Dakota agreed not to govern Indian people in Indian country and has never been granted any powers to do so.

Meanwhile, Congress has repeatedly maintained a unique legal relationship with Indian people. Numerous programs have been created to assist Indian people. As has been noted, the Congress in 1976 explicitly recognized a federal responsibility for Indian health care.

In the wake of this history throughout which state powers have been consistently circumscribed and federal responsibility has been explicitly recognized, it would simply make no sense to hold that state officials had either the power or the duty to restrain and treat Florence Red Dog. In other words, even if the court could rationally conclude that the process and fact of involuntary commitment were compatible with contemporary notions of Indian sovereignty, then it would appear that the state should be held to have no power or duty in the circumstances of. this case by virtue of history alluded to, *supra.* To hold that South Dakota had the power to involuntarily commit a reservation person would be inconsistent with the evolving pattern of legislation and case law over the past centu-

ry; hence, the holding that the state has no jurisdiction rests upon a dual rationale: (1) the holding tends to preserve vestiges of tribal sovereignty *and* (2) it is consistent with the federal assumption of responsibility over Indian persons and the corresponding limits of state power.

### XVI.

The final question to consider is the question of justiciability which normally would get the first attention of this Court. However, the manner in which this case has unfolded has, made it necessary to give this question last minute consideration.

Federal defendants' contention that there is no justiciable controversy because *all* priorities are within the discretion of I.H.S. officials must be rejected for the reasons stated in the discussion of the merits; therefore, the only issue relating to justiciability is that of possible mootness. There is no doubt that a live controversy was presented when the suit was filed. Florence Red Dog had not received any care in a secured treatment setting and it did not appear at all likely that she would receive any without a court order. Obviously, the order requiring state and county officials to act did not moot the questions presented.

The question of mootness only arose after Florence Red Dog's release from the Human Services Center subsequent to this Court's order by virtue of which she was committed. If she had required no further care, several issues formerly live would have then been rendered moot with the possible exception of a damage claim.

Plaintiff has not vigorously pursued, and this Court will dismiss, the claim for damages. First, there is no evidence in the record to support a finding of monetary damage. Second, it appears that the federal defendants have a qualified immunity from civil suits challenging their official actions. In the absence of bad faith, liability will not lie. *Economou v. U. S. Dept. of Agriculture*, 535 F.2d 688 (2nd Cir. 1976). Finally, plaintiff has given no indication that she even intends to sue the United

States for damages for alleged wrongful acts of federal defendants in their official capacities; consequently, there is no federal tort claim. Thus, if only a damage claim had kept this case alive, it would now be moot.

The inquiry then must focus upon plaintiff's condition after her release from the Human Services Center and the necessity or desirability of either further injunctive relief or declaratory relief. Plaintiff has requested that the Court take notice of certain public records from the Pennington County Court files and also certain documents (also public records) from the Human Services Center in Yankton. This Court does take judicial notice of the same, and on the basis of these finds: (1) that Florence Red Dog, after being released from the Human Services Center subsequent to her commitment pursuant to an order of this Court, was again committed on an emergency basis by the Pennington County Board of Mental Health; (2) that Florence Red Dog presently requires treatment and restraint; and (3) that it is likely that Florence Red Dog will again require commitment at some future time; and (4) that the situation which precipitated this controversy will likely arise again in the near future if Florence Red Dog is released into the care of her family on the reservation.

Although there is more than one contingency that would have to occur before the situation faced at the outset of this lawsuit would be recreated, this Court strongly believes that a finding of mootness at this time would surely be error. In *Taylor v. United States*, 385 F.Supp. 1034 (N.D.Ill.1974), the Court was faced with a situation wherein a veteran had been denied admission to a Veteran's Administration Hospital solely because he stood accused of a crime. Under the district court's restraining order, the hospital admitted him, and before the suit was decided on the merits the veteran had been released under medication. The district court found the controversy "anything but moot." 385 F.Supp. at 1036. The Court relied upon the fact that the policy of the Veterans Administration had not changed since the time the plaintiff was refused treatment; hence, the wrong complained of was "very much capable of repetition." 385 F.Supp. at 1036.

This case is likewise anything but moot. The situation that gave rise to the controversy is likely to be repeated in the near future. If the rights and responsibilities of the parties are not clear, the consequences could be tragic. This situation ought to be avoided by declaring the rights and responsibilities of the parties now. The very purpose of a declaratory judgment is to provide *prospective* relief. *See* v. 10, Wright and Miller, *Federal Practice and Procedure*, § 2751.

The Second Circuit Court of Appeals, in clarifying the criteria for awarding declaratory relief stated:

Such relief will be proper only (1) where the judgment will serve a useful purpose in clarifying and settling the legal relations in issue; or (2) when it will terminate and afford relief from the uncertainty, insecurity and controversy giving rise to the proceedings. *Maryland Casualty Company v. Rosen*, 445 F.2d 1012, 1014 (1971).

The uncertainty and insecurity that underlay this controversy at the beginning are as present now as when the suit was commenced. A declaratory judgment will serve the vital purpose of defining rights and responsibilities in the area of Indian health care.

The foregoing contains the Court's findings of fact and conclusions of law, and a declaratory judgment will be entered in accordance with these findings and conclusions.

### APPENDIX A

#### I.

### STATEHOOD AND THE RELINQUISHMENT OF JURISDICTION OVER INDIAN COUNTRY

On February 22, 1889, the Congress of the United States passed an Enabling Act (25 Statutes at Large 676). It was "[a]n act

to provide for the division of Dakota into two States, and to enable the people of North Dakota, South Dakota, Montana, and Washington to form constitutions and State governments and to be admitted into the union on an equal footing with the original States, and to make donations of public lands to such States." 25 Statutes at Large 676. A condition of statehood was set out in Section 4 of the Enabling Act as follows:

[T]he people inhabiting said proposed States *do agree and declare* that they forever disclaim all right and title to the unappropriated public lands lying within the boundaries thereof, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States, and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.

The people of South Dakota agreed and declared in Article XXII of their State Constitution (styled as a Compact with the United States) as follows:

[W]e, the people inhabiting the state of South Dakota, *do agree and declare* that we forever disclaim all right and title to the unappropriated public lands lying within the boundary of South Dakota, and to all lands lying within said limits owned or held by any Indian or Indian tribes; and that until the title thereto shall have been extinguished by the United States, the same shall be and remain subject to the disposition of the United States; and said Indian lands shall remain under the absolute jurisdiction and control of the Congress of the United States.

South Dakota was admitted to the Union in 1889 upon the express condition that Indian lands within the borders of the State remain under the *absolute jurisdiction and control* of the Congress of the United States. Congress intended that the State of South Dakota, its future governors, its future legislative assemblies, and its future courts would (as long as the compact lasted) have no jurisdiction over certain Indian lands.

It would be an oversimplification to even suggest that the relinquishment was in fact absolute relinquishment over a geographical area, *i. e.* that reservations became truly foreign sovereignties within the exterior boundaries of South Dakota. Case law cracked the jurisdictional barrier which, in theory at least, had been erected around the geographical entities known as Indian country.[1] But, these incursions aside, the relinquishment agreement remained intact and unquestioned until 1957.

## II.

### PUBLIC LAW 280 AND SOUTH DAKOTA'S REJECTION OF JURISDICTION OVER INDIAN COUNTRY

In 1953 the 83rd Congress passed what has come to be popularly known as Public Law 280.[2] This act was an attempt by Congress to reverse the jurisdictional arrangement made between numerous states and the federal government concerning Indian country. Public Law 280 stated in relevant part:

Notwithstanding the provisions of any Enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State constitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil and criminal jurisdiction in accordance with the provisions of this Act: *Provided,* That the provisions of this Act shall not become effective with respect to such assumption of jurisdiction by any such State until the

---

1. See *State ex rel. Olson v. Shoemaker*, 73 S.D. 120, 39 N.W.2d 524 (1949) which relies upon *United States v. McBratney*, 104 U.S. 621, 26 L.Ed. 869 (1882) and *Draper v. United States*, 164 U.S. 240, 17 S.Ct. 107, 41 L.Ed. 419 (1896).

2. 67 Stat. 588.

people thereof have appropriately amended their State constitution or statutes as the case may be. § 6 of Public Law 280.

The consent of the United States is hereby given to any other State not having jurisdiction with respect to criminal offenses or civil causes of action, or with respect to both as provided for in this Act, to assume jurisdiction at such time and in such manner as the people of the State shall, by affirmative legislative action, obligate and bind the State to assumption thereof. § 7 of Public Law 280.

Jurisdiction over Indian country was not forced upon South Dakota; the law merely allowed South Dakota citizens the free choice to either accept or reject an invitation to repeal that portion of their State Constitution which relinquished jurisdiction over Indian country to the United States. The South Dakota legislature acted pursuant to this authorization in 1957, and in Chapter 319 of the Session Laws of that year, assumed and accepted jurisdiction over *all criminal and civil cases of action* arising in Indian country. Chapter 319 stated in relevant part:

BE IT ENACTED BY THE LEGISLATURE OF THE STATE OF SOUTH DAKOTA:

Section 1. In accordance with the provisions of 67 statutes at large, page 589, Public Law 280, and as Indian Country is defined by Title 18 USCA, Section 1151, the provisions of Chapter 106 of the Session Laws of the State of South Dakota for 1901, as amended, or any law to the contrary, notwithstanding, the state of South Dakota assumes and accepts jurisdiction of all criminal and civil causes of action arising in Indian Country under the provisions of this Act as hereinafter set forth.

Section 4. Jurisdiction shall not be deemed assumed or accepted by this state in any county of South Dakota unless and until a resolution assuming and accepting the same is adopted by the Board of County Commissioners of any county containing Indian Country.

Section 5. Be it further provided that no assumption of civil or criminal jurisdiction shall become effective under the provisions of this Act until the Tribal council of a Tribe over which state jurisdiction is to be taken, shall have considered a referendum in which all persons eligible to vote at elections held for the purposes of electing officers of such Tribe, shall have been given an opportunity to approve or disapprove such assumption of jurisdiction.

It is important to note that Section 4 and Section 5 of the Session Laws of 1957 made the legislature's assumption of jurisdiction over Indian Country a qualified and contingent assumption. Two conditions were required to be fulfilled by specified groups of people before the transfer of jurisdiction would be effective: (1) County Commissioners of each county containing Indian Country were required to accept the transfer of jurisdiction by resolution;[3] (2) each Tribal Council was required to consider a referendum of the Indian people on the jurisdiction question.[4] Thus, the legislature by its qualified acceptance turned the decision over to county commissioners and the Indian tribes.

The transfer of jurisdiction was not made. In 1959 the Supreme Court of South Dakota, in a case centering on a jurisdictional question, paused to comment in regard to the 1957 qualified acceptance: "We digress to observe that the conditions imposed by the terms of this acceptance have not been performed." *In re High Pine's Petition*, 99 N.W.2d 38, 41 (S.D.1959).

In 1961 the South Dakota Legislature made another attempt at a qualified acceptance of jurisdiction over Indian Country. (1961 Session Laws, chap. 464). This acceptance stated in relevant part as follows:

---

3. A condition precedent was that each Board of County Commissioners contract with the Bureau of Indian Affairs for reimbursement for added costs to any county occasioned by the assumption of jurisdiction.

4. A tribal council could not approve the transfer of jurisdiction to the state without first finding a majority of eligible Indian voters in favor of the transfer.

BE IT ENACTED BY THE LEGISLA-
TURE OF THE STATE OF SOUTH
DAKOTA:

Section 1. The State of South Dakota,
in accordance with the provisions of 67
Statutes at Large, page 589 (Public Law
280), hereby assumes and accepts jurisdic-
tion of all criminal offenses and civil
causes of action arising in the Indian
Country located within this State, as In-
dian Country is defined by Title 18 Unit-
ed States Code Annotated, section 1151,
and obligates and binds this State to the
assumption thereof . . . .

Section 4. Except as to criminal of-
fenses and civil causes of action arising
on any highways, as the term is defined
in SDC 28.0101, the jurisdiction provided
for in Section 1 herein shall not be
deemed assumed or accepted by this
State, . . . unless and until the
Governor of the State of South Dakota, if
satisfied that the United States of Ameri-
ca has made proper provisions for the
reimbursement to this State and its coun-
ties for the added costs in connection
with the assumption of said jurisdiction,
has issued his proper proclamation duly
filed with the Secretary of State declar-
ing the said jurisdiction to be assumed
and accepted.

The county commissioners were not re-
quired to act; they were, however, autho-
rized to negotiate with B. I. A. officials for
reimbursements to counties for increased
expenses. The various tribes and councils
had no role whatever. The jurisdictional
transfer was contingent only upon a proper
proclamation by the South Dakota Gover-
nor if and when he was satisfied that the
United States had provided reimbursement
for the added costs to the state and counties
occasioned by the assumption of jurisdic-
tion. No proclamation came forth; conse-
quently, South Dakota did not become a
"Public Law 280 state."

In 1963 the South Dakota Legislature
took up the jurisdiction question for a third
time and this time made an unconditional,

and constitutionally acceptable, assumption
of jurisdiction over Indian Country. (Ses-
sion Laws of 1963, chap. 467). The act was
styled as an amendment to Chapter 464 of
the South Dakota Session Laws of 1961 and
stated in relevant part:

BE IT ENACTED BY THE LEGISLA-
TURE OF THE STATE OF SOUTH
DAKOTA:

Section 1. The State of South Dako-
ta, in accordance with the provisions of 67
Statutes at Large, page 589 (Public Law
280), hereby assumes and accepts jurisdic-
tion of all criminal offenses and civil
causes of action arising in the Indian
Country located within this State, as In-
dian Country is defined by Title 18 Unit-
ed States Code Annotated, section 1151,
and obligates and binds this State to the
assumption thereof . . . .

The acceptance, however, was referred to
the people of South Dakota for their consid-
eration in the 1964 general election; it was
resoundingly defeated. The votes compiled
were: for State assumption of jurisdiction
—58,289; against State assumption of juris-
diction—201,389.[5] This was South Dakota's
last attempt to assume jurisdiction over In-
dian Country via the provisions of Public
Law 280.

III.

THE SWITCH IN FEDERAL POLICY—
THE CIVIL RIGHTS ACT OF 1968

In 1968 Congress changed federal policy
toward the states wherein Indian Country
is located; a new plan for possible transfer
of jurisdiction over Indian Country from
the United States to a state was devised.[6]
This plan is codified now in Subchapter III
of the Indian Civil Rights Act. (25 U.S.C.
§§ 1321–1326.)

Section 1321, pertaining to criminal juris-
diction, states:

The consent of the United States is
hereby given to any State not having

5. S.D.Laws, 1965, p. 508.

6. 82 Stat. 78.

jurisdiction over criminal offenses committed by or against Indians in the areas of Indian country situated within such State to assume, with the consent of the Indian tribe occupying the particular Indian country or part thereof which could be affected by such assumption, such measure of jurisdiction over any or all of such offenses committed within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over any such offense committed elsewhere within the State, and the criminal laws of such State shall have the same force and effect within such Indian country or part thereof as they have elsewhere within the State.

Section 1322, pertaining to civil jurisdiction, states:

The consent of the United States is hereby given to any State not having jurisdiction over civil causes of action between Indians or to which Indians are parties which arise in the areas of Indian country situated within such State to assume, with the consent of the tribe occupying the particular Indian country or part thereof which would be affected by such assumption, such measure of jurisdiction over any or all such civil causes of action arising within such Indian country or any part thereof as may be determined by such State to the same extent that such State has jurisdiction over other civil causes of action, and those civil laws of such State that are of general application to private persons or private property shall have the same force and effect within such Indian country or part thereof as they have elsewhere within that State.

Section 1324 contains the United States' consent to alter the state's constitution, where necessary, to remove impediments to the assumption of jurisdiction; it states:

Notwithstanding the provisions of any enabling Act for the admission of a State, the consent of the United States is hereby given to the people of any State to amend, where necessary, their State con-

stitution or existing statutes, as the case may be, to remove any legal impediment to the assumption of civil or criminal jurisdiction in accordance with the provisions of this subchapter.

Finally, the transfer of jurisdiction is made contingent upon a majority vote of enrolled, adult Indians in an affected area, and said election is to be called by the Secretary of the Interior "under such rules and regulations as he may prescribe, when requested to do so by the tribal council or other governing body, or by 20 per centum of such enrolled adults." 25 U.S.C. § 1326.

The conditions for transfer of jurisdiction pursuant to the 1968 Civil Rights Act have not been fulfilled. The Pine Ridge Indian Reservation has to this day remained Indian Country. The consequence is that South Dakota has assumed neither criminal jurisdiction nor jurisdiction over civil causes of action between Indians or to which Indians are parties if the cause(s) of action arises in Indian Country.