649 F.2d 1274
 WHITE MOUNTAIN APACHE TRIBE, Plaintiff-Appellant,
v.
STATE OF ARIZONA, DEPARTMENT OF GAME AND FISH, et al.,
Defendants-Appellees.
CONFEDERATED TRIBES OF the COLVILLE INDIAN RESERVATION,
Plaintiff-Appellees,
v.
STATE OF WASHINGTON and Ralph Larson, individually and as
Director of the State of Washington Department of
Game, Defendants-Appellants.
 Nos. 78-3427, 79-4294.
 United States Court of Appeals,
Ninth Circuit.
 Argued Feb. 13, 1980.*
Submitted June 19, 1980.
Decided April 6, 1981.
As Amended on Denial of Rehearing and Rehearing En Banc June 22, 1981.
 
 Kathleen A. Rihr, Whitewater, Ariz., argued for Apache Tribe, Daniel H. Israel, Boulder, Colo., on brief.
 James M. Johnson, Asst. Atty. Gen., Olympia, Wash., argued for State of Wash., Dennis D. Reynolds, Asst. Atty. Gen., Olympia, Wash., on brief.
 Steven J. Silver, Asst. Atty. Gen., Phoenix, Ariz., Joshua I. Schwartz, Washington, D. C., for State of Ariz. et al.
 Barry Ernstoff, Ziontz, Pirtle, Morisset, Ernstoff & Chestnut, Seattle, Wash., argued for Colville Indian Reservation; Steven S. Anderson, Seattle, Wash., on brief.
 Appeal from the United States District Courts for the District of Arizona and for the Eastern District of Washington.
 Before MERRILL and CHOY, Circuit Judges, and EAST,** District judge.
 CHOY, Circuit Judge:
 
 
 1
 These cases present the question whether an Indian tribe can prevent a state from enforcing state hunting and fishing license requirements and substantive regulations against non-Indians who hunt and fish on a reservation with the tribe's permission. We vacate the summary judgment entered against the White Mountain Apache Tribe (Apaches) and affirm the preliminary injunction granted in favor of the Confederated Tribes of the Colville Indian Reservation (Colvilles).
 
 I. Facts
 
 2
 The Apaches and Colvilles market to non-Indian sportsmen the opportunity to hunt and fish on their large reservations in Arizona and Washington, respectively. The tribes sell these sportsmen tribal hunting and fishing licenses, and the tribes and their members also profit from sales of food, lodging and tourist goods and services. The tribes have enacted detailed hunting and fishing codes, which purport to make state law inapplicable to non-Indian sportsmen on the reservation.
 
 
 3
 The United States Fish and Wildlife Service stocks tribal waters with fish for the sportsmen to catch; federal money and manpower also aid tribal fish and wildlife management activities. The respective states provided comparable services on the reservations in the past, but not at the present.
 
 
 4
 Natural and artificial barriers allegedly prevent all or some of the fish and wildlife from migrating onto or off of the reservations.
 
 
 5
 The laws of the states license and regulate hunting and fishing. The states concedes that they cannot precondition or restrict in any way tribal members' own hunting and fishing within the reservations; that the tribes can bar non-Indian tourist sportsmen from the reservations completely or, if they choose to admit them, subject them to tribal license requirements and substantive regulations; and that a state cannot authorize a non-Indian to engage in any hunting or fishing within the reservation that the tribe prohibits.
 
 
 6
 The two cases differ in the following respects:
 
 
 7
 (1) The Apache case involves both hunting and fishing, the Colville case only fishing.
 
 
 8
 (2) The Apaches attack only the state license requirement; the Colvilles also attack the state substantive regulations.
 
 
 9
 (3) The Apaches rely only on the right of tribal self-government;[1] the Colvilles also raise several other issues.
 
 
 10
 (4) Arizona concedes that at this time its agents do not enter the Apache reservation without Apache permission, and proposes to accost non-Indian violators of state laws only after such violators leave the reservation; Washington asserts the right of its agents to enter the reservation as well.
 
 
 11
 (5) Arizona has not taken civil and criminal jurisdiction over the Apaches and their reservation under the Act of August 15, 1953, §§ 6-7, Pub. L. No. 83-280, 67 Stat. 588 (Public Law 280); Washington has taken such jurisdiction over the Colvilles and their reservation.
 
 
 12
 (6) The Apaches elected to accept, and are organized under, the Indian Reorganization Act of 1934; the Colvilles did not and are not. (The Colvilles are, however, a federally-recognized Indian tribe.)
 
 
 13
 (7) A district court entered a summary judgment against the Apaches; a district court entered a preliminary injunction in favor of the Colvilles, stating that they enjoyed a high probability of success on the merits.[2]
 
 
 14
 (8) A district court found that the Apaches had demonstrated no financial harm; a district court found that the Colvilles would suffer "great harm," quite possibly including loss of income, absent an injunction.
 
 II. Preemption
 A. The Rule in Indian Cases
 
 15
 After the district court decisions in the cases before us, the Supreme Court laid down a specific rule for analyzing preemption claims in Indian cases generally and in cases involving non-Indians on reservations particularly. The Supreme Court stated where "a State asserts authority over the conduct of non-Indians engaging in activities on the reservation," the court must make "a particularized inquiry into the nature of the State, Federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665 (1980) (Apache Logging Case).
 
 
 16
 The Court emphasized that this rule, rather than the normal rules of federal-state preemption, must be applied in Indian cases. Id. at 144, 100 S.Ct. 2584.
 
 
 17
 The unique historical origins of tribal sovereignty make it generally unhelpful to apply to federal enactments regulating Indian tribes those standards of pre-emption that have emerged in other areas of the law. Tribal reservations are not States, and the differences in the form and nature of their sovereignty make it treacherous to import to one notions of pre-emption that are properly applied to the other.
 
 
 18
 Id. at 143, 100 S.Ct. at 2583. For example, in Indian cases weight must be given to the tradition of "Indian sovereignty over the reservation and tribal members" and the "firm federal policy of promoting tribal self-sufficiency and economic development." Id. Thus, unlike in normal preemption cases, ambiguities in federal law are resolved in favor of preemption, and an "express congressional statement" of preemption is unnecessary. Id. at 140, 100 S.Ct. at 2582-2585.
 
 
 19
 We interpret the substance of this rule to be that in Indian cases preemption questions are to be settled not so much by divining the actual intent of Congress, but rather by weighing in the judicial scales the present-day state, federal and tribal interests involved.[3] We are also mindful of the framework of analysis used in the Apache Logging Case itself, where the Supreme Court held Arizona was preempted from imposing certain taxes on a non-Indian logging contractor working for an on-reservation tribal enterprise because of three factors:
 
 
 20
 (1) the comprehensive and pervasive federal regulatory scheme for harvesting and marketing Indian timber left no room for additional state taxes or burdens;
 
 
 21
 (2) "the assessment of state taxes would obstruct federal policies (relating to the profitability and management of the Indian logging enterprise)"; and
 
 
 22
 (3) there was no "regulatory function or service performed by the State that would justify the assessment of taxes," the "general desire to raise revenue" alone being an insufficient justification for taxation here in light of the "significant geographical component to tribal sovereignty," a factor which (although "not absolute") is "important" and "highly relevant" in preemption analysis. Id. at 147, 100 S.Ct. at 2586.
 
 
 23
 We will utilize the same framework of analysis in these cases.
 
 B. Pervasive Regulatory Scheme
 
 24
 1. Statutes Specifically Relating to Hunting and Fishing
 
 
 25
 Congress has consistently and explicitly preserved state fish and game regulation in areas under potentially exclusive federal control. See, e. g., 16 U.S.C. § 528 (national forests); id. § 668dd(c) (National Wildlife Refuge System); id. §§ 670h(b) & (c)(4), 670i(b)(4), 670k(6) (other public lands). Federal statutes specifically dealing with non-reservation hunting and fishing by non-Indians reveal a total lack of intent to preempt state law by direct federal fish and game regulation.[4]
 
 2. Public Law 280 and the Enabling Acts
 
 26
 Public Law 280 extended state civil and criminal jurisdiction over actions to which Indians are parties in five states. See 18 U.S.C. § 1162; 28 U.S.C. § 1360. Public Law 280, as amended, also allows for the assumption of civil and criminal jurisdiction over Indian country by other states if certain conditions are satisfied. See 25 U.S.C. § 1321. The general grant of jurisdiction in Public Law 280 is subject to certain exclusions:
 
 
 27
 Nothing in this section shall deprive any Indian or any Indian tribe, band, or community of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting, trapping, or fishing or the control, licensing, or regulation thereof.
 
 
 28
 18 U.S.C. § 1162(b); 25 U.S.C. § 1321(b).
 
 
 29
 Although Public Law 280 was not a grant of general civil regulatory control over Indians, see Bryan v. Itasca County, 426 U.S. 373, 385, 390, 96 S.Ct. 2102, 2109, 2111, 48 L.Ed.2d 710 (1976), under Public Law 280, states retain the regulatory jurisdiction over the on-reservation activities of non-Indians that they enjoyed prior to that Law (and absent the effect of the Enabling Acts, see infra). Fort Mojave Tribe v. County of San Bernardino, 543 F.2d 1253, 1257 (9th Cir. 1976).
 
 
 30
 When Washington took jurisdiction over the Colville reservation, Congress released the state from its obligation, embodied in the Washington Enabling Act, 25 Stat. 676, 677 (1889), and Wash.Const. Art. XXVI, para. 2, to "forever disclaim all right and title" to the land of Indian tribes and concede that that land shall remain "under the absolute jurisdiction and control of the Congress of the United States." See Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463, 479-88, 99 S.Ct. 740, 750, 58 L.Ed.2d 740 (1979). Arizona has not taken advantage of the opportunity to relieve itself from the essentially identical obligation that Congress imposed upon it, see Arizona Enabling Act, 36 Stat. 557, 569 (1910); Ariz.Const. Art. XX, para. 4. Thus we must examine the federal interest and intent manifested in the Arizona Enabling Act.
 
 
 31
 When Arizona entered the Union, it expressly conditioned its entry on the premise that it would:
 
 
 32
 (F)orever disclaim all right and title to all lands lying within said boundaries owned or held by any Indian or Indian tribes, the right or title to which shall have been acquired through or from the United States or any prior sovereignty, and that until the title of such Indian or Indian tribes shall have been extinguished the same shall be and remain subject to the disposition and under the absolute jurisdiction and control of the Congress of the United States.
 
 
 33
 Arizona Enabling Act, 36 Stat. 557, 569.
 
 
 34
 But Enabling Acts themselves forced states to disclaim only their proprietary interest in Indian land, not the states' governmental or regulatory authority over that land. Organized Village of Kake v. Egan, 369 U.S. 60, 67-69, 82 S.Ct. 562, 566, 7 L.Ed.2d 573 (1962); see id. at 67-68, 76, 82 S.Ct. at 566, 571 (pointing out that Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251 (1959), was decided on the basis of interference with the right of tribal self-government and not on the basis of the Arizona Enabling Act disclaimer); Jicarilla Apache Tribe v. United States, 601 F.2d 1116, 1135 (10th Cir.), cert. denied, 444 U.S. 995, 100 S.Ct. 530, 62 L.Ed.2d 426 (1979); Francisco v. State, 113 Ariz. 427, 430, 556 P.2d 1, 4 (1976). But see McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 176 n. 15, 93 S.Ct. 1257, 1264 n. 15, 36 L.Ed.2d 129 (1973) (certain treaty language, in conjunction with Enabling Act language, can preclude state jurisdiction over on-reservation Indians).
 
 
 35
 In Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134, 100 S.Ct. 2069, 65 L.Ed.2d 10 (1980), the Colville Cigarettes Case, the Supreme Court said that the Enabling Act disclaimers reflect "an intent that the State not tax reservation lands or income derived therefrom." 100 S.Ct. at 2082. The cigarette taxes involved there, however, were "assessed against nonmembers of the Tribes and concern transactions in personalty with no substantial connection to reservation lands," and therefore were permissible. Id. Similarly, Arizona's disclaimer does not preclude it from imposing a license fee on non-Indians hunting and fishing on a reservation, even though such a fee is related to reservation realty. A state license fee is not a property tax or a tax on a tribe's own license income; the fee is paid by "nonmembers of the Tribes," id., and has only an indirect effect on the tribal treasury. Therefore the federal interest, as expressed in the Arizona Enabling Act disclaimer, in ousting state jurisdiction over non-Indians' activities on reservation land is not entitled to much weight.
 
 
 36
 3. Federal Policy of Indian Self-Determination
 
 
 37
 Federal policy toward Indians now favors self-determination, rather than assimilation. See, e. g., Indian Reorganization Act of 1934, 25 U.S.C. §§ 461-479; Indian Self-Determination and Education Assistance Act of 1975, §§ 2(a), 3(a)-(b), 25 U.S.C. §§ 450(a), 450a(a)-(b). This policy is furthered by increasing tribal authority over reservations and by helping tribes to become economically self-sufficient. This federal policy does not necessarily preclude state regulation of non-Indian activity, however; in the Colville Cigarettes Case the Supreme Court reviewed several federal statutes embodying the policy but concluded that Washington's cigarette and sales taxes were not preempted as to non-Indians' purchases of cigarettes on reservations. Accordingly the policy and the corresponding tribal interests are entitled to weight in the preemption scales here only to the extent that concurrent state licensing and regulation of non-Indian hunting and fishing on reservations actually impede tribal authority and self-determination.
 
 
 38
 4. Delegation Under the Indian Reorganization Act
 
 
 39
 Both tribes here have adopted codes which regulate hunting and fishing in comprehensive detail, impose tribal license fees, and purport to nullify state law. If such codes had been enacted by Congress, we would instantly find preemption. See, e. g., Apache Logging Case, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed.2d 665. The tribal preemptive interests created by these codes, however, are not as weighty as would be comparable federal interests. Thus, we have held that where a state has a valid conservation interest, comprehensive tribal hunting and fishing regulations (absent a delegation of federal preemptive power) would not preempt state law in the way that comprehensive federal regulations might. United States v. Montana, 604 F.2d 1162, 1172 (9th Cir. 1979), cert. granted, 445 U.S. 960, 100 S.Ct. 1645, 64 L.Ed.2d 234 (1980).[5]
 
 
 40
 Ordinarily, federal and tribal preemptive interests do not merge; courts must undertake a tricorner "particularized inquiry into the nature of the State, Federal, and tribal interests at stake" in preemption disputes. Apache Logging Case, 448 U.S. at 145, 100 S.Ct. at 2584. Congress has manifested no intent whatsoever to delegate to tribes the "far-reaching authority" to preempt state fees and regulations otherwise applicable to non-Indians, nor would the opposite be inferred even from "federal approval of the Indian taxing ordinances, or from the fact that the Tribes exercise congressionally sanctioned powers of self-government."[6] See Colville Cigarettes Case, 100 S.Ct. at 2082-83.
 
 
 41
 In the absence of such delegation, we consider that the tribes asserted only tribal interests when they attempted to exercise preemptive power over state law. These interests can represent no more than their own weight in the Indian-law preemption scales, even if federal interests (which are entitled to separate weight in the balance) generally favor or are advanced by such a tribal assertion. We now consider whether state licensing and regulation conflict with these federal and tribal interests which in fact tend to coincide.
 
 
 42
 C. Conflict with Federal and Tribal Policies
 
 
 43
 The federal government has a policy, expressed in treaties, statutes and administrative practice, of encouraging tribal political autonomy and economic self-sufficiency. The tribes also have an interest in attaining these goals. Moreover, for historical and cultural reasons Indians have a special interest in preserving and exploiting the fish and game within reservation boundaries, and the federal government has a corresponding policy to advance that interest. Since these policies and interests do not of themselves preempt concurrent state licensing and regulation of non-Indian activities on reservations, we must examine the extent to which such state licensing and regulation conflict with the federal and tribal policies and interests.
 
 
 44
 The United States, recognizing that tribes enjoy only a limited sovereignty, does not treat them as independent states. Therefore, for purposes of state jurisdiction over non-Indians, the federal interest in tribal political autonomy does not itself negate the fact that Indian reservations are parts of the states. Whether the federal interest in tribal autonomy, combined with the tribe's own interest, is sufficient to preclude the operation of state law upon non-Indians on Indian land depends upon a careful weighing of those interests and that of the state in the particular situation under review.
 
 
 45
 Therefore, we turn our attention to the policies and interests favoring tribal economic self-sufficiency. State taxes that directly or indirectly take reservation-based wealth from Indians are usually preempted, see McClanahan v. Arizona State Tax Commission, 411 U.S. 164, 93 S.Ct. 1257, 36 L.Ed.2d 129 (income tax on Indians); Central Machinery Co. v. Arizona State Tax Commission, 448 U.S. 160, 100 S.Ct. 2599, 65 L.Ed.2d 684 (1980) (sales tax on non-Indian seller, passed on to Indians). But many cases have held that nondiscriminatory state taxes on the activities of non-Indians on reservations are valid[7] even though the taxes have the indirect effect of reducing revenues that Indians might otherwise receive, see Colville Cigarettes Case, 100 S.Ct. at 2080-84 (tax on cigarette purchases); Thomas v. Gay, 169 U.S. 264, 273, 18 S.Ct. 340, 343, 42 L.Ed. 740 (1898) (tax on lessees' cattle); Fort Mojave Tribe v. County of San Bernardino, 543 F.2d 1253, 1256 (9th Cir. 1976) (tax on leaseholds). Compare Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. 463, 480-81, 96 S.Ct. 1634, 1644, 48 L.Ed.2d 96 (1976) (taxation of Indian activities invalid), with id. at 483, 96 S.Ct. at 1646 (tax on non-Indian purchasers of cigarettes on reservations upheld). The tribal interest in obtaining such revenues weighs only lightly in the preemption scales, for "the Tribes have no vested right to a certain volume of sales to non-Indians, or indeed to any such sales at all." Colville Cigarettes Case, 100 S.Ct. at 2080 n.27. Moreover, when both state and tribe license the same activity "(t)here is no direct conflict between the state and tribal schemes, since each government is free to impose its taxes without ousting the other." Id. at 2084. Nonetheless, the federal and tribal interests in maximizing tribal revenue still exist.
 
 
 46
 Although the extent to which the state license fee damages the tribal economic interest (and related federal policy) will not receive great weight in the preemption scales, that extent must be properly ascertained at the district court level. The tribal interest in raising revenues for essential governmental programs does gain strength when the revenues are derived from value generated on the reservation by activities involving the tribes and when the taxpayer is the recipient of tribal services. Colville Cigarettes Case, 100 S.Ct. at 2083.
 
 
 47
 The applicability of the state's substantive regulations to non-Indians hunting and fishing on reservations presents a slightly different problem. "Enactments of the Federal Government passed to protect and guard its Indian wards only affect the operation, within the (reservation) of such state laws as conflict with the federal enactments. (Citation omitted)." Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. at 483, 96 S.Ct. at 1646. State season, size, and other substantive limits that coincide with or are more lenient than applicable tribal regulations do not conflict with them. Non-Indian sportsmen who obey tribal regulations are ipso facto in compliance with such state laws; and if a non-Indian violates tribal regulations then state law enforcement merely reinforces the authority of the tribal code.
 
 
 48
 When state regulations are more restrictive than their tribal counterparts, on the other hand, the state is in the position of prohibiting certain on-reservation activities which the tribe would license. This creates a direct conflict between the state regulations and the tribe's ability to raise money, if non-Indians will not risk the violation of state law. Since the effect of such regulations would merely be to decrease the revenues otherwise flowing into tribal coffers, as in the dual-taxation situation, the tribal interest is not overly weighty. Although the indignity to the tribe of revenue lost by direct state prohibition, rather than by indirect economic forces, itself carries a certain weight, we have held that where a state substantive regulation is based on conservation and is more restrictive than a conflicting tribal regulation, the state's regulation may be applied to non-Indians hunting or fishing on a reservation. United States v. Montana, 604 F.2d at 1171.
 
 D. State Interests
 1. Conservation
 
 49
 The fact that fish and game are presently upon an Indian reservation does not negate the state interest in conserving them, along with all other fish and game within the boundaries of the state. A tribe cannot claim to "own" the fish and game on the reservation so as to deprive the state of any interest in them. See Douglas v. Seacoast Products, Inc., 431 U.S. 265, 284, 97 S.Ct. 1740, 1751, 52 L.Ed.2d 304 (1977). The state has a "special interest in regulating and preserving wildlife for the benefit of its citizens." Baldwin v. Montana Fish & Game Commission, 436 U.S. 371, 392, 98 S.Ct. 1852, 1864, 56 L.Ed.2d 354 (1978) (Burger, C. J., concurring); see id. at 386, 98 S.Ct. at 1861 (majority opinion). This state interest is shared with, not displaced by, the similar tribal interest when the fish and game are within the boundaries of both the state and the reservation.[8]
 
 
 50
 The weight of the state conservation interest depends in large part, however, on the extent to which fish and game migrate across reservation boundaries. We were not presented with district court findings on the extent of such migration. If the fish and game are migratory, the state interest becomes quite powerful. States have an obvious interest in conserving animals which, if protected, would move off reservations onto state lands; moreover, states have an interest in animals that migrate from state lands, where they survive by virtue of the states' conservation efforts, onto reservations. Thus, we held in United States v. Montana, 604 F.2d at 1171-72, that state hunting and fishing regulations and license requirements, if their purpose is to further conservation and proper fish and game management, may be enforced against non-Indians on reservations.[9]
 
 2. Revenue
 
 51
 The states might also claim a revenue interest to support their license fee requirements. The Supreme Court has noted that a state's revenue interest in taxing non-Indian activity on reservations is "strongest when the tax is directed at off-reservation value and when the taxpayer is the recipient of state services." Colville Cigarettes Case, 100 S.Ct. at 2083.
 
 
 52
 As to the non-Indians' receipt of state services, the tribes discount the states' revenue interest on this ground by arguing that the states no longer perform any fish-and-game-related stocking, enforcement or management services on the reservations that might justify an interest in compensatory revenue.[10] District court findings are also required on this issue.
 
 III. Right of Tribal Self-Government
 
 53
 Preemption analysis focuses on the extent to which federal law has removed from states power, which they otherwise would have possessed, over Indians and reservations. Analysis of the right of tribal self-government, on the other hand, focuses on whether pre-existing Indian immunities from regulation of themselves and their land have been withdrawn by federal statute, surrendered by treaty, or lost as a necessary result of a tribe's present dependent status.[11] See United States v. Wheeler, 435 U.S. 313, 323, 98 S.Ct. 1079, 1086, 55 L.Ed.2d 303 (1978). We hold that the right of tribal self-government extends only to intratribal relations and to concurrent civil authority over visitors to reservations.
 
 
 54
 When a state has proposed to tax non-Indians for their on-reservation activities, the courts have almost uniformly found the tax permissible, even if the tribe was laying its own tax on the same activities; the consequent reduction of Indian tax and business revenues does not violate the right of tribal self-government. Colville Cigarettes Case, 100 S.Ct. at 2082-83; Fort Mojave Tribe v. County of San Bernardino, 543 F.2d at 1258. Double taxation does not diminish a tribe's authority to tax non-Indians or otherwise regulate them,[12] Colville Cigarettes Case, 100 S.Ct. at 2084, and a tribe has "no vested right to a certain volume of sales to non-Indians, or indeed to any such sales at all," id. 100 S.Ct. at 2080 n.27.
 
 
 55
 We therefore adhere to our holding in United States v. Montana, 604 F.2d at 1171-72, that nondiscriminatory state hunting and fishing license requirements may be imposed on non-Indians on reservations without violating the right of tribal self-government where the state has a substantial conservation interest.
 
 
 56
 Where valid state and tribal substantive regulations differ, both are enforceable, id. at 1171; the applicability of state law in no case prevents a tribe from exercising its right to adopt and enforce ordinances regulating visitors' hunting and fishing. Accordingly, we also adhere to our holdings that nondiscriminatory state substantive hunting and fishing regulations may be applied to non-Indians on reservations without violating the right of tribal self-government. Id. at 1171-72; United States v. Sanford, 547 F.2d at 1089.[13]
 
 IV. Commerce Clause
 
 57
 The Colvilles argue that Congress's power "To regulate Commerce with foreign Nations, and among the several States, and with the Indian Tribes" precludes the state's application of its nondiscriminatory license requirements and regulations to non-Indians on reservations. U.S.Const. Art. I, § 8, cl. 3. We find their argument meritless.
 
 V. Conclusion
 A. The Colvilles
 
 58
 The Colvilles were granted a preliminary injunction by the district court. The Ninth Circuit standard for granting and reviewing a preliminary injunction was recently stated in Los Angeles Memorial Coliseum Commission v. National Football League, 634 F.2d 1197, 1200 (9th Cir. 1980). The court said:
 
 
 59
 We start with the general principle that an order issuing or denying a preliminary injunction will normally be reversed only if the lower court abused its discretion or based its decision upon erroneous legal premises. The reviewing court must determine whether the district court employed the proper legal standard in issuing the injunction and whether it abused its discretion in applying that standard. An injunction may so be set aside if the court relied on erroneous legal premises in its application of the standard, such as in its preliminary review of the merits. The traditional equitable criteria for granting preliminary injunctive relief are (1) a strong likelihood of success on the merits, (2) the possibility of irreparable injury to plaintiff if the preliminary relief is not granted, (3) a balance of hardships favoring the plaintiff, and (4) advancement of the public interest, (in certain cases). In this circuit, the moving party may meet its burden by demonstrating either (1) a combination of probable success on the merits and the possibility of irreparable injury or (2) that serious questions are raised and the balance of hardships tips sharply in its favor. (Citations omitted.)
 
 
 60
 The Colvilles have met the latter test by demonstrating as our discussion has indicated that their case raises serious questions and that, in view of the disparity in size and revenue sources between the tribe and the state, the balance of hardships does tip in the Colvilles' favor. The district court's grant of a preliminary injunction in their favor is AFFIRMED.
 
 B. The Apaches
 
 61
 This court may remand a case to the district court for further consideration when new cases or laws that are likely to influence the decision have become effective after the initial consideration. We feel that such a remand is proper in the Apaches' case due to the important United States Supreme Court decision in White Mountain Apache Tribe v. Bracker, 448 U.S. 136, 100 S.Ct. 2578, 65 L.Ed. 24, 665 (1980). On remand the district court should consider and make factual findings as to the factors mentioned above, including but not limited to the conflict between the state license requirements and regulations and the federal and tribal policies and interests, the extent to which the state license fee damages the tribal economic interest and related federal policy, the state's interest in conservation, the migratory nature of the wildlife in issue, and the benefits, if any, to non-Indians hunting on the reservation of state services and the state revenue interests.
 
 
 62
 The summary judgment against the Apaches is VACATED and the case REMANDED for further proceedings.[14]
 
 
 
 *
 Although these cases were argued separately, we have combined them for disposition because they raise similar legal issues
 
 
 **
 The Honorable William G. East, Senior United States District Judge for the District of Oregon, sitting by designation
 
 
 [1]
 This has been their position here and below
 
 
 [2]
 In the Apaches' action for injunctive and declaratory relief, the district court entered a summary judgment on the merits in Arizona's favor, even though Arizona had requested summary judgment only on a jurisdictional ground. The Apaches appealed on the merits
 In the Colvilles' initial action for injunctive and declaratory relief, the district court agreed that the promulgation of the tribal fishing regulations was an exercise of delegated federal preemptive authority, which preempted state regulations and license requirements. 412 F.Supp. 651 (E.D.Wash.1976). We reversed, finding that even if federal preemptive power had been delegated to the Colvilles, they had not yet used that power. 591 F.2d 89 (9th Cir. 1979). After obtaining a dismissal without prejudice of the remanded case, the Colvilles formally exercised every bit of preemptive power they possessed. They then filed the present action and obtained from the district court a preliminary injunction against enforcement of the state regulations and license requirements. The state appealed.
 We hold that, given this history, no issue in the Colvilles' present action is precluded by res judicata.
 
 
 [3]
 Compare Colville Cigarettes Case, 100 S.Ct. at 2093 (Rehnquist, J., concurring and dissenting)
 
 
 [4]
 For example, 18 U.S.C. § 1165, which prohibits going upon Indian land, without lawful authority or permission, for the purpose of hunting or fishing, does not "mak(e) illegal the unauthorized killing of wildlife on Indian reservations"; it prohibits trespass, not acts done while trespassing. United States v. Sanford, 547 F.2d 1085, 1088-89 (9th Cir. 1976). Section 1165 "does not represent an attempt by the federal government to enter the arena of fish and game regulation on Indian reservations," id. at 1089; it merely supplies a federal forum for vindication of the tribal right to admit non-Indian sportsmen only at the tribe's pleasure
 Similarly, the provisos of 18 U.S.C. § 1162(b) and 25 U.S.C. § 1321(b) that nothing in Public Law 280 shall "deprive any Indian tribe of any right, privilege, or immunity afforded under Federal treaty, agreement, or statute with respect to hunting or fishing or the control, licensing, or regulation thereof" create no new Indian rights. They merely provide that Public Law 280 does not deprive affected Indian tribes of any previously-granted federal rights regarding, inter alia, the licensing of hunting and fishing. See Metlakatla Indian Community v. Egan, 369 U.S. 45, 57, 82 S.Ct. 552, 560, 7 L.Ed.2d 562 (1962) (purpose of § 1162(b) was "to preserve federally granted fishing rights," not to grant new rights or to preserve fishing-related rights of a nonfederal origin).
 
 
 [5]
 The Montana decision was reversed by the Supreme Court on another ground after this opinion was originally filed. United States v. Montana, -- U.S. --, 101 S.Ct. 1245, 67 L.Ed.2d 493 (1981). We consider this court's holding in Montana on this issue valid
 
 
 [6]
 This passage disproves the contention that Fisher v. District Court, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106 (1976), can be construed to hold that Congress, by authorizing tribal constitutions and councils in § 16 of the Indian Reorganization Act of 1934, 25 U.S.C. § 476, delegated its preemptive power to such councils, exercisable in any ordinance authorized by such a constitution. In any event, just as the Supreme Court in the Colville Cigarettes Case found that the ordinances of the Makah Tribe, an Indian Reorganization Act tribe, did not preempt state cigarette and sales taxes by delegated federal authority, we find that § 476 delegates no authority to preempt the state laws here
 
 
 [7]
 One month after the Supreme Court held in McClanahan that Arizona could not tax the reservation income of a Navajo Indian, it dismissed for want of a substantial federal question an appeal arguing that Arizona could not tax the reservation income of a non-Indian tribal employee living on the Navajo reservation. Kahn v. Arizona State Tax Commission, 411 U.S. 941, 93 S.Ct. 1917, 36 L.Ed.2d 404 (1973). A dismissal for want of a substantial federal question has the effect of a holding that the proffered ground is meritless. Hawaiian Telephone Co. v. Hawaii Dept. of Labor & Indus. Relations, 614 F.2d 1197, 1198 (9th Cir. 1980)
 
 
 [8]
 The states assert that their police power extends, unless positively barred by federal law, to the regulation of all taking of wildlife by non-Indians anywhere within the geographical limits of the state. We agree. On the other hand, whether a federal barrier exists depends on a weighing of federal, tribal, and state interests, and apparent state authority or power to enforce state law is not itself a state interest in enforcing that law
 
 
 [9]
 In United States v. Montana, id. at 1171-72 n.15, we distinguished the Fourth Circuit's Cherokee Fishing Case, 588 F.2d 75 (4th Cir. 1978), on the ground that Montana had a weighty conservation interest in the migratory game, whereas North Carolina had none in the nonmigratory fish
 
 
 [10]
 If the states succeed in demonstrating a conservation interest, then their expenditures for off-reservation enforcement of state law against on-reservation violators immediately create a valid revenue interest
 In Warren Trading Post Co. v. Arizona Tax Commission, 380 U.S. 685, 85 S.Ct. 1242, 14 L.Ed.2d 165 (1965), the Supreme Court mentioned as a reason for concluding that Congress had intended to preempt state taxation of federally-licensed Indian traders that
 Congress has, since the creation of the Navajo Reservation nearly a century ago, left the Indians on it largely free to run the reservation and its affairs without state control, a policy which has automatically relieved Arizona of all burdens for carrying on those same responsibilities.
 Id. at 690, 85 S.Ct. at 1245. On the other hand, taxation of reservation Indians has been found to be preempted even where the state was making substantial governmental expenditures on the reservation, McClanahan v. Arizona State Tax Commission, 411 U.S. at 173 & n.12, 93 S.Ct. at 1262 & n.12 (Navajo reservation); Moe v. Confederated Salish & Kootenai Tribes, 425 U.S. at 476, 96 S.Ct. at 1642, and no compensating-expenditures analysis can be found in United States v. Montana or the cases involving double taxation of non-Indians on reservations. But see Apache Logging Case, 448 U.S. at 148, 100 S.Ct. at 2586.
 
 
 [11]
 The limited, present-day right of tribal self-government has devolved from the broad tribal sovereignty principle of Worcester v. Georgia, 31 U.S. (6 Pet.) 515, 557, 561, 8 L.Ed. 483 (1832), as "notions of Indian sovereignty have been adjusted to take account of the State's legitimate interests in regulating the affairs of non-Indians," McClanahan v. Arizona State Tax Commission, 411 U.S. at 171, 93 S.Ct. at 1261, and Indian military power has been extinguished. The leading expression of the present-day right is that reservation Indians enjoy the right "to make their own laws and be ruled by them," Williams v. Lee, 358 U.S. at 220, 79 S.Ct. at 270; state regulation of on-reservation affairs is forbidden if it infringes this "right of tribal self-government," Apache Logging Case, 448 U.S. at 143, 100 S.Ct. at 2583
 
 
 [12]
 By contrast, it would violate the right of tribal self-government for a state court to take jurisdiction over a suit against an Indian arising on a reservation, for the state court's judgment might be utterly irreconcilable with any parallel tribal-court jurisdiction and judgment. See Fisher v. District Court, 424 U.S. 382, 96 S.Ct. 943, 47 L.Ed.2d 106; Williams v. Lee, 358 U.S. 217, 79 S.Ct. 269, 3 L.Ed.2d 251
 
 
 [13]
 Thus, we disagree with the Cherokee Fishing Case, 588 F.2d 75, in which the Fourth Circuit found that by indirectly reducing the revenues of the tribe and individual Indians, a state fishing license fee violated the right of tribal self-government by impeding tribal financial self-sufficiency, a "goal" of self-government. The court found that no state law could be permitted to "frustrate the Indians' governance of themselves or any commercial, conservationist or other program administered by the Indians for their own advantage." Id. at 78, 79
 However, it was established in the Colville Cigarettes Case that a nondiscriminatory state tax on non-Indians does not violate the right of tribal self-government even if it has the indirect effect of crippling a tribal commercial program; that much of the Cherokee Fishing Case surely cannot stand. We do not now decide whether a state tax or fee which, although otherwise valid, renders a tribe so destitute that it cannot finance even the barest essentials of self-government (e. g., the tribal council, court and police) would violate the right. Cf. Santa Clara Pueblo v. Martinez, 436 U.S. 49 at 64, 98 S.Ct. 1670 at 1680, 56 L.Ed.2d 106 (construing statute not to impose financial burden on tribes).
 
 
 [14]
 We note the Tenth Circuit's recent decision in a case quite similar to our cases here. Mescalero Apache Tribe v. New Mexico, 630 F.2d 724 (10th Cir. 1980). The Tenth Circuit there affirmed the district court's judgment and held that New Mexico could not impose its hunting and fishing regulations on the activities of non-Indians on the Mescalero Apache reservation. This conclusion rested independently on both the federal preemption and the right of tribal self-government grounds