Honorable Gregory L. Coler Secretary Department of Health and Rehabilitative Services 1317 Winewood Boulevard Tallahassee, Florida 32301
Dear Secretary Coler:
Your predecessor requested an opinion on substantially the following questions:
 1) IF A PRIVATE CORPORATION SEEKS TO CONSTRUCT A HOSPITAL OR OTHER HEALTH CARE FACILITY ON LAND OWNED BY THE SEMINOLE INDIAN TRIBE, MUST THAT HOSPITAL OR HEALTH CARE FACILITY OBTAIN A CERTIFICATE OF NEED AS MANDATED BY s. 381.493, F.S., PRIOR TO COMMENCING CONSTRUCTION?
 2) MUST THE FOREGOING HOSPITAL OR HEALTH CARE FACILITY BE LICENSED AND REGULATED BY THE STATE OF FLORIDA PURSUANT TO CH. 395, F.S., AND THE RULES PROMULGATED THEREUNDER?
As your questions are interrelated, they will be answered together.
According to your letter and supplementary materials, Hospital Development Associates, Inc. (hereafter HDA) proposes the purchase of approximately sixteen acres of land adjacent to the Seminole Indian Reservation in Broward County. HDA would then donate the land to the Seminole Tribe of Florida (hereafter Seminoles). HDA would lease back for a term of fifty years approximately fourteen acres on which to construct a "comprehensive health and medical facility to service the members of the Seminole Tribe of Florida and others." As part of the agreement, the Seminoles have petitioned the United States Secretary of the Interior to hold the foregoing lands in trust for the use of the Seminoles. See,25 U.S.C. § 465 and 415; 25 C.F.R. § 151 and 162.
The agreement provides that "the operation of all facilities placed on the property shall comply with the regulations and requests of the Joint Commission for Accreditation of Hospitals and the Indian Health Service." HDA has agreed to "use every reasonable effort to facilitate the employment of enrolled members of the . . . [Seminoles] or other Indian Tribes on the leased land and enterprises conducted thereon to the extent that their skills and abilities can be profitably utilized." Upon termination of the lease, HDA will surrender and deliver to the Seminoles all buildings and improvements upon the land, which shall then belong to the Seminoles.
I have been informed that HDA will own and operate the facility. Thus, your question involves the applicability of Florida law on non-Indian property located on Indian trust land, which will be managed by non-Indians and which will serve both Indians and non-Indians.
The Seminoles have promulgated Ordinance No. C-02-87, entitled "An Ordinance Regulating and Permitting the Operation of Hospitals on the Seminole Tribe of Florida Lands Under Certain Times and Conditions" (hereafter Hospital Ordinance). The Hospital Ordinance provides for the licensure and regulation of hospitals and ambulatory surgical centers. See generally, ss. 1 and 4, Hospital Ordinance. And see, s. 3(24), Hospital Ordinance, which defines a "Regular License" as "[a]n unrestricted license issued to a hospital in recognition of substantial compliance with rules and standards of Chapter 10D-28 FAC as authorized under Florida Statute 395." Cf., s. 3(25), Hospital Ordinance, defining "Provisional License." Pursuant to s. 3(28), Hospital Ordinance:
 All references to the Florida Statutes are a means of providing standards for building and operation of hospital facilities and shall not in any way be deemed to grant to the State of Florida jurisdiction, legal or administrative, over Indian Country, except that which is specifically expressed in Federal Statutes by the Congress of the United States.
Section 5(1) of the ordinance provides that the Tribal Council is responsible for making, or causing to be made, "such [licensure] inspections and investigations as it deems necessary." Any doctor of medicine or osteopathy, dentist, podiatrist, psychologist, and nurse anesthetist, licensed under "any State Statute in the United States" may practice in the foregoing facility. See, ss. 10 and 28, Hospital Ordinance. And see, s. 8, Hospital Ordinance (clinical laboratory tests performed by or for the hospital facility must be performed by clinical laboratory licensed under any state statute in the United States). The Seminoles have also adopted Ordinance No. C-03-87 entitled "An Ordinance Supplying the Minimum Requirements of Construction and Equipment for Hospital and Medical Facilities." The ordinance consists of a copy of a 1979 publication on the subject by the then United States Department of Health, Education, and Welfare, presently the Department of Health Human Services.
In a supplementary correspondence with this office, the United States Department of the Interior, Bureau of Indian Affairs, has concluded that: 1) state regulation under the foregoing facts is not preempted by federal law; 2) state regulation of hospitals which provide services to non-Indians does not infringe upon a tribe's right to make its own laws and be governed by them; and 3) state regulations are inapplicable to the extent they interfere with the tribe's regulatory control over health care services to its own members. For the following reasons, I concur with the foregoing conclusions.
Section 381.494(1), F.S., mandates that all health care related projects described therein, including the new construction or establishment of additional health care facilities, are subject to review under the "Health Facilities and Health Services Planning Act," and accordingly, must file applications for a certificate of need. See, ss. 381.493, 381.494, 381.495, 381.498 and 381.499, F.S., comprising the "Health Facilities and Health Services Planning Act. A certificate of need is defined in s. 381.493(3)(c) as "a written statement issued by the department [of Health and Rehabilitative Services, hereafter HRS] evidencing community need for a new, converted, expanded, or otherwise significantly modified health care facility, health service, or hospice." Pursuant to s. 381.494(8)(a), "[t]he department is designated as the single state agency to issue, revoke, or deny certificates of need and to issue, revoke, or deny exemptions from certificate-of-need review in accordance with the district plans [see, s. 381.494(7)(b)] and present and future federal and state statutes."
It is unlawful for any person to undertake a project subject to review under the Health Facilities and Health Services Planning Act without a valid certificate of need. See, s. 381.495(2), F.S., which declares it to be a misdemeanor of the second degree to violate the provisions of the act. Section 381.495(4), F.S., and s. 381.4945, F.S. (1986 Supp.), set forth exemptions to the requirement of obtaining a certificate of need; however, such exemptions do not address the type of facility under consideration. Cf., s. 381.499, F.S., empowering HRS to "maintain an action in the name of the state for injunction or other process against any person to restrain or prevent the pursuit of a project subject to review under this act, in the absence of a valid certificate of need."
The enactment of the certificate of need program by the state was "prompted by the federal government in an effort to contain the high and rising cost of health care." Bio-Medical Applications of Clearwater, Inc. v. Department of Health and Rehabilitative Services, Office of Community Medical Facilities, 370 So.2d 19, 20
(2 D.C.A.Fla., 1979). Cf., 42 U.S.C.A. ss. 300m-2(a)(4)(B) and m-6, repealed by Pub.L. 99-660, Title VII, s. 701(a), Nov. 14, 1986, 100 Stat. 3799, effective January 1, 1987. The State of Florida in responding to such a need enacted the Health Facilities and Health Services Planning Act, stating in s. 381.493(2):
 It is the intent of the Legislature to stimulate the establishment and continuous reevaluation of community-oriented health goals by providers, consumers, and public agencies; to assist in the rational examination of alternate methods of achieving those goals; and to aid in their achievement through the most effective means possible within the limits of available resources. It is imperative to plan the rendering of health services in order to meet and provide for community health needs in a responsible and effective manner. . . . Every consideration shall be given to the elimination of unnecessary duplication of health services and the provision of health services which are not currently available or which are insufficiently provided within the community. . . . (e.s.)
Chapter 395, F.S., governs hospital licensing and regulation. Section 395.001, F.S., sets forth the legislative intent "to provide for the protection of public health and safety in the establishment, construction, maintenance, and operation of hospitals and ambulatory surgical centers by providing for licensure of same and for the development, establishment, and enforcement of minimum standards with respect thereto." No person or governmental unit, as defined in s. 395.002(5), may establish, conduct, or maintain a hospital or ambulatory surgical center in this state without first obtaining a license under Part I, Ch. 395. Section 395.003(1)(a), F.S. Applications for licenses, or renewals, must be made to HRS and must contain such information as required by that department. Section 395.004(1), F.S. Part I, Ch. 395, also addresses, inter alia, review of plans and specifications for each project as well as construction inspections and investigations, s. 395.007; licensure inspections and investigations, s. 395.006; staff membership, s. 395.011 (1986 Supp.); discipline of staff, s. 395.0115; patient billing, s. 395.015; patient records, ss. 395.016, 395.0165, and 395.017; internal risk management program, s. 395.041 (1986 Supp.); and minimum standards for clinical laboratory test results and diagnostic X-ray results, s. 395.009. Cf., Part III, Ch. 154, F.S. (Health Facilities Authorities Law); Part V, Ch. 154, F.S. (State Health Facilities Authority Law).
In the materials accompanying your predecessor's request, specific reference was made to Public Law 83-280. Under Public Law 83-280
(Act of Aug. 15, 1953, Ch. 505, 67 Stat. 588-90, hereafter Pub.L. 280) Congress provided a vehicle governing the assumption by states of civil and criminal jurisdiction over reservation Indians. See, Seminole Tribe of Florida v. Butterworth,658 F.2d 310 (5th Cir. 1981). Sections 2 and 4 of Pub.L. 280 (codified respectively at 18 U.S.C.A. s. 1162 and 28 U.S.C.A. s. 1360) granted certain states the right to exercise criminal jurisdiction and limited civil jurisdiction over Indian tribes. Section 7 of Pub.L. 280 authorized the remaining states to assume criminal and civil jurisdiction by legislative enactment. Although s. 7 was repealed by Pub.L. 90-284, Title IV, s. 403, 82 Stat. 79 (1968), any cessions of jurisdiction made pursuant to s. 7 prior to its repeal were not affected. See, 25 U.S.C.A. s. 1323(b). Pursuant to s. 7, Pub.L. 280, the Florida Legislature had enacted s. 285.16, F.S., which provides in subsection (2) that "[t]he civil and criminal laws of Florida shall obtain on all Indian reservations in this state and shall be enforced in the same manner as elsewhere throughout the state."
In Bryan v. Itasca County, Minnesota, 426 U.S. 373 (1976), the Supreme Court construed s. 4 of Pub.L. 280 to grant states jurisdiction over private civil litigation involving reservation Indians in state court, but not to grant general civil regulatory authority. The Court held that the primary concern of Congress in enacting Pub.L. 280 was the problem of lawlessness on certain Indian reservations, and the lack of adequate tribal institutions for law enforcement. Id. at 379. The Court stated "that if Congress in enacting Pub.L. 280 had intended to confer upon the States general civil regulatory powers, including taxation, over reservation Indians, it would have expressly said so." Id. at 390.
In Seminole Tribe of Florida v. Butterworth, 491 F. Supp. 1015
(S.D.Fla. 1980), aff'd, 658 F.2d 310 (5th Cir. 1981), cert. den.,455 U.S. 1020 (1982), the Seminole Indian Tribe of Florida sued to enjoin the enforcement of s. 849.093, F.S., governing bingo operations. The district court held that "by adopting Fla.Stat. s.285.16, Florida could assume no more jurisdiction than was ceded to it by Public Law 280." 491 F. Supp. at 1020. Citing Bryan v. Itasca County, supra, the court declared s. 849.093 to be civil/regulatory in nature rather than criminal/prohibitory and thus, unenforceable against the Seminoles. On appeal, the Fifth Circuit affirmed the holding of the lower court and held that "the mandate from the Supreme Court is that states do not have general regulatory power over the Indian tribes." 658 F.2d at 313. The Fifth Circuit also rejected appellant's request to require the Seminoles to distinguish between Indian and non-Indian players and to abide by the restrictions of the statute as to non-Indians, stating at 316:
 It is not altogether clear how petitioner proposes that such distinctions practically could be made without prohibiting non-Indians from play or imposing the restrictions on all players, Indian and non-Indian alike.
 Furthermore, the relief sought continues to request the right to enforce regulation of the Indians [sic] operation of bingo games.
The court noted that s. 849.093, F.S., made no reference to violations of its restrictions by the bingo players:
 The bingo statute does not prohibit the playing of bingo games in violation of its restrictions. . . . The courts that have prohibited Indians or non-Indians from gambling on reservations have done so in light of a statute that specifically prohibits the act of gambling. (Emphasis supplied by court).
Id. at 316. The court also noted that "the only regulation involved is directed at the Indian operators of the bingo hall, not its non-Indian bingo player." Id. at 317, n. 9.
In light of the judicial decisions discussed above, I am compelled to conclude that the State of Florida lacks general regulatory authority over the Seminoles. Although the violation of the certificate of need requirement of the Health Facilities and Health Services Planning Act and the operation of a hospital without a license under Part I, Ch. 395, F.S., constitute criminal infractions (see, respectively ss. 381.495[2]; 395.018[1], F.S.), I cannot conclude that such provisions are criminal/prohibitory so as to be applicable to the Seminoles by operation of Pub.L. 280. There are, however, substantial factual differences between the instant inquiry and Seminole Tribe of Florida v. Butterworth, supra. Butterworth concerned the application of state law to a bingo operation conducted on the Seminole reservation. The Fifth Circuit noted that "[t]he operation of bingo halls . . . must necessarily remain on the reservation." 658 F.2d at 315. On the other hand, a "comprehensive health and medical facility" treating Indians and non-Indians will produce far-reaching ramifications both within and outside of the reservation boundaries. Moreover, unlike Butterworth, supra, in which the state sought to regulate the Indian operators of the bingo halls, here the state seeks to regulate a health care facility owned and operated by non-Indians.
It has been stated that:
 Public Law 280 was intended as a grant of jurisdiction not as a prohibition on exercising jurisdiction the state would otherwise possess. Bryan v. Itasca County . . . is not to the contrary. Bryan simply takes a narrow view of what was granted by Public Law 280 and does not turn Public Law 280 into a prohibitory statute.
People of South Naknek v. Bristol Bay Borough, 466 F. Supp. 870,879 (D.Alaska 1979); State v. Lemieux, 317 N.W.2d 166, 169 n. 10 (Wis.Ct.App. 1981), affirmed, 327 N.W.2d 669 (Wis. 1983). Cf., Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463, 490 (1979) ("Pub.L. 280 was intended to facilitate, not to impede, the transfer of jurisdictional responsibility to the States."). I am therefore of the opinion that neither Seminole Tribe of Florida v. Butterworth, supra, nor Pub.L. 280 operates to bar state regulation of the type of facility under consideration.
State laws generally do not apply to tribal Indians or an Indian reservation unless Congress has expressly provided that state laws are so applicable. McClanahan v. State Tax Commission of Arizona,411 U.S. 164 (1973). However, as the Court in McClanahan also stated, "notions of Indian sovereignty have been adjusted to take account of the State's legitimate interests in regulating the affairs of non-Indians." (e.s.) Id. at 171. And see, Rice v. Rehner, 463 U.S. 713, 718 (1983), in which the Court noted the recent "trend . . . away from the idea of inherent Indian sovereignty as a bar to state jurisdiction and toward reliance on federal pre-emption." Cf., AGO 77-29. See also, Organized Village of Kake v. Egan, 369 U.S. 60, 74 (1962) (Congress has to substantial degree opened doors of reservations to state laws).
In determining whether a particular state law may be applied to an Indian reservation or to members of a tribe, there is no rigid rule. White Mountain Apache Tribe v. Bracker, 448 U.S. 136 (1980). Although Indian tribes have been partially assimilated into American culture, they retain a semi-independent status which has been described as that of "a separate people, with the power of regulating their internal and social relations, and thus far not brought under the laws of the Union or of the State within whose limits they resided." (e.s.) Id. at 142. However, except in the special area of state taxation of Indian tribes and tribal members, there is no inflexible per se rule precluding state jurisdiction over tribes and tribal members in the absence of express congressional consent. California v. Cabazon Band of Mission Indians, ___ U.S. ___, 107 S.Ct. 1083, 1091 (1987).
The United States Supreme Court has upheld the application of state laws on reservations, "unless such application would interfere with reservation self-government or would impair a right granted or reserved by federal law." Mescalero Apache Tribe v. Jones, 411 U.S. 145, 148 (1973); White Mountain Apache Tribe v. Bracker, supra. See also, Washington v. Confederated Bands and Tribes of the Yakima Indian Nation, 439 U.S. 463, 498 (1979) ("state jurisdiction is complete as to all non-Indians on reservations and is also complete as to Indians on non trust lands.") Cf., New Mexico v. Mescalero Apache Tribe, 462 U.S. 324
(1983), wherein the Court, citing Puyallup Tribe v. Department of Game of the State of Washington, 433 U.S. 165 (1977), stated that in exceptional circumstances a state may even assert jurisdiction over the on-reservation activities of tribal members.
When only on-reservation activities of Indians are involved, state law is generally inapplicable because the federal interest in encouraging tribal self-government is at its strongest while the regulatory interest of the state is likely to be minimal. White Mountain Apache Tribe v. Bracker, supra at 144. Whether, however, state authority applies over the conduct of non-Indians engaging in activity on an Indian reservation calls for "a particularized inquiry into the nature of the state, federal, and tribal interests at stake, an inquiry designed to determine whether, in the specific context, the exercise of state authority would violate federal law." Id. In assessing the federal and tribal interests, traditional notions of Indian sovereignty provide a "crucial `backdrop'" against which any assertion of state authority must be weighed. New Mexico v. Mescalero Apache Tribe, supra at 334.
My research has not revealed any judicial decision which has addressed a factual situation similar to that under consideration in the instant inquiry. Rather, the cases have examined the application of state law on Indian reservations and the interplay of federal, Indian and state jurisdiction in such contexts as taxation, licensing, hunting, and fishing. For example, in Moe v. Confederated Salish and Kootenai Tribes of the Flathead Reservation, 425 U.S. 463 (1976) (hereafter Moe), the United States Supreme Court upheld the right of the State of Montana to require an Indian retailer on a reservation to add a sales or excise tax on articles sold to non-Indians and thereby aid the state's collection and enforcement of the tax. The court stated that "[t]he State's requirement that the Indian tribal seller collect a tax validly imposed on non-Indians is a minimal burden designed to avoid the likelihood that in its absence non-Indians purchasing from the tribal seller will avoid payment of a concededly lawful tax." (e.s.) Id. at 483. The Court concluded that such burden neither frustrated tribal self-government nor violated any congressional enactment concerning the affairs of reservation Indians.
Similarly, in State of Washington v. Confederated Tribes of the Colville Indian Reservation, 447 U.S. 134 (1980), the Court upheld the imposition of Washington's cigarette and sales taxes upon on-reservation purchases by non-Indian or Indian nonmembers of the Confederated Tribes of the Colville Indian Reservation. Relying on its earlier opinion in Moe, supra, the Court held that a state-imposed nondiscriminatory tax on non-Indian customers of Indian retailers doing business on the reservation may be valid "even if it seriously disadvantages or eliminates the Indian retailer's business with non-Indians." (e.s.) Id. at 151.
The Court also considered whether the imposition by the tribe of a tax upon on-reservation purchases by nonmembers of the tribe prevented the state from imposing its own tax upon such purchases. Answering the question in the negative, the Court noted no direct conflict between the state and tribal programs, because each government was free to impose its taxes without ousting the other. The Court held that principles of federal Indian law, "whether stated in terms of pre-emption, tribal self-government, or otherwise," did not authorize Indian tribes to market an exemption from state taxation to individuals who would ordinarily do their business elsewhere. Id. at 155. Cf., State of Florida, Department of Business Regulation v. United States Department of the Interior, 768 F.2d 1248, 1256 n. 10 (11th Cir. 1985), in which the court stated "[w]e note only that, as a matter of federal law, Florida is not prohibited from imposing a tax on cigarette sales made to non-Indians, even those occurring on land held in trust by the United States."
In Rice v. Rehner, 463 U.S. 713 (1983), the Court held that California could require a tribal member and a federally licensed Indian trader, operating a general store on a reservation, to obtain a state liquor license in order to sell liquor for off-premises consumption. The Court held that Congress had never recognized any sovereign tribal interest in regulating liquor traffic and historically had anticipated that the state would exercise such concurrent regulatory authority over the use and distribution of liquor on Indian reservations. Any interest in tribal sovereignty implicated by imposition of California's regulatory scheme was held to exist only to the extent that the state attempted to regulate the sale of liquor to other members of the tribe. Id. at 721. The Court noted at 724 that "[a] State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention." (e.s.)
In State of Montana v. United States, 450 U.S. 544, 565 (1981), the Court stated that an "[Indian] tribe may regulate, through taxation, licensing, or other means, the activities of nonmembers who enter consensual relationships with the tribe or its members, through commercial dealing, contracts, leases, or other arrangements." However, the Court reasoned at 564 that the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations is inconsistent with the dependent status of the tribes, and so cannot survive without express congressional delegation." (e.s.)
A holding of the court of appeals, however, not addressed by the Supreme Court and subsequently affirmed by the lower court on appeal after remand, upheld the power of the state to regulate hunting and fishing by non-members of the Indian tribe within the exterior boundaries of the reservation. The court approved such regulation by the state provided that it did not indirectly regulate the hunting and fishing by members of the tribe on its land and the purpose of the regulations was "the conservation and proper management of game and fish and not to discriminate against, nor to impede, authorized regulation by the Crow Tribe." United States v. State of Montana, 686 F.2d 766, 769 (9th Cir. 1982). See, White Mountain Apache Tribe v. State of Arizona, Department of Game and Fish, 649 F.2d 1274, 1284 (9th Cir. 1981), holding, inter alia, that "[w]here valid state and tribal substantive regulations differ, both are enforceable, . . . the applicability of state law in no case prevents a tribe from exercising its right to adopt and enforce ordinances regulating visitors' hunting and fishing." But see, New Mexico v. Mescalero Apache Tribe, 462 U.S. 324 (1983), where the state was enjoined from enforcing concurrent authority over hunting and fishing by nonmembers of the tribe. In that case, however, the Court emphasized that the exercise of concurrent jurisdiction by the state would operate to nullify the tribe's authority to control hunting and fishing on the reservation. The Court further found that the state failed to identify any regulatory function or service that would justify the assertion of concurrent regulatory authority. Moreover, the state could not point to any off-reservation effects that would warrant state intervention.
Therefore, to the extent that state regulation interferes with a tribe's ability to legislate on its members' health and welfare, such regulation violates the tribe's right to make its own laws and to be governed by them. Cf., White v. Califano, 437 F. Supp. 543
(D.S.D. 1977), aff'd., 581 F.2d 697 (8th Cir. 1978) (state has no power to involuntarily commit an Indian person residing in Indian country). However, your question pertains to a hospital facility to be located upon Indian trust land, which facility will be owned and managed by non-Indians and which will serve both Indians and non-Indians. In order for application of Ch. 395, F.S., and the Health Facilities and Health Services Planning Act to be barred, such regulations must be shown to "interfere with reservation self-government or . . . impair a right granted or reserved by federal law." Mescalero Apache Tribe v. Jones, supra at 148.
The provision of health care to Indians is generally governed by the Indian Health Care Improvement Act, Pub.L. No. 94-437,90 Stat. 1400. However, my examination of the foregoing law and amendments failed to reveal any evidence that the federal government intended to preempt the regulation of a health care facility providing care to non-Indians. Cf., F. Cohen, Handbook of Federal Indian Law, p. 653 (1982), which concludes that federal benefits programs are not considered preemptive of state law, citing to, inter alia, Morton v. Ruiz, 415 U.S. 199, 208-209
(1974). Nor has my research of other applicable federal statutes revealed, nor have you apprised me of any, provisions which would operate to constrain HRS from imposing state regulations on a facility providing health care to non-Indians even though located on trust lands. See generally, 42 U.S.C.A. ss. 291-291a (Hill-Burton Act) concerning, inter alia, grants to the states for the construction and modernization of hospitals and other medical facilities. Section 291m provides:
 Except as otherwise specifically provided nothing in this subchapter shall be construed as conferring on any Federal officer or employee the right to exercise any supervision or control over the administration, personnel, maintenance, or operation of any facility with respect to which any funds have been or may be expended under this subchapter.
And see, Mulvihill v. Julia L. Butterfield Memorial Hospital,329 F. Supp. 1020, 1022-1023 (S.D.N.Y. 1971) (Hill-Burton Act "was designed to induce the states to assume, as a state function, the burden of supervising the maintenance and construction of hospitals throughout the state"; "[p]articipation in the Hill-Burton program subjects the hospital to an elaborate pattern of state and federal regulation.") (e.s.) See also, 42 U.S.C.A. ss. 2005-2005f, authorizing funds for the construction of Indian hospital facilities. As a condition to providing assistance under s. 2005, the Surgeon General must "assure that the hospital is operated in compliance with State standards for operation and maintenance of hospitals which receive Federal aid under title VI of the Public Health Service Act [generally 42 U.S.C.A. ss. 291 et seq., supra]." (e.s.) 42 U.S.C.A. s. 2005b(b). See also, 42 U.S.C.A. s. 2005f, which is substantially identical to 42 U.S.C.A. s. 291m, supra. Compare, 42 U.S.C.A. s. 1395x(e) defining "hospital" for purposes of the Medicare Act to mean an institution which
 (7) in the case of an institution in any State in which State or applicable local law provides for the licensing of hospitals, (A) is licensed pursuant to such law or (B) is approved, by the agency of such State or locality responsible for licensing hospitals, as meeting the standards established for such licensing. . . .
In addition, 42 C.F.R. § 482.11(b)(2) and (c), provides that as a condition for participation in the Medicare program a hospital must, among other things, be "[a]pproved as meeting standards for licensing established by the agency of the State or locality responsible for licensing hospitals" and that "[t]he hospital must assure that personnel are licensed or meet other applicable standards that are required by State or local laws." Cf., 25 U.S.C.A. s. 231, providing that "[t]he Secretary of the Interior, under such rules and regulations as he may prescribe, shall permit the agents and employees of any State to enter upon Indian tribal lands, reservations, or allotments therein (1) for the purpose of making inspection of health and educational conditions. . . ."
I am therefore of the opinion that regulation of the facility in providing health care to non-Indians is not preempted by federal law. Moreover, while the health of members of an Indian tribe and the ability of the tribe to provide health care to its members are clearly proper concerns of the tribe, my research has revealed no Indian authority or tradition of supplying health care to non-Indians. Cf., Oliphant v. Suquamish Indian Tribe, 435 U.S. 191
(1978) (Indian tribal courts have no inherent criminal jurisdiction to try and punish non-Indians and may not assume such jurisdiction unless authorized by Congress); Rice v. Rehner, supra (no tradition or authority in favor of liquor regulation by Indians). The hospital facility under consideration will be owned and managed by non-Indians and will serve both Indians and non-Indians. Based upon the foregoing case law, I cannot conclude that the application of the state's certificate of need requirement or the provisions of Ch. 395, F.S., would interfere with reservation self-government or constitute an intrusion into reservation affairs. Rather, the application of state regulations would appear to be in accord with the State of Florida's "legitimate interests in regulating the affairs of non-Indians." McClanahan v. State Tax Commission of Arizona, supra at 171.
In balancing the federal, Indian, and state interests, the interests of the federal government and the Seminoles in supplying health care services to members of the Seminole Tribe are significant. See, e.g., 25 U.S.C.A. s. 1601 of the Indian Health Care Improvement Act; White v. Califano, 437 F. Supp. 543
(D.S.D. 1977), aff'd., 581 F.2d 697 (8th Cir. 1978). However, when the provision of health care to non-Indians is at issue, I am of the view that the balance shifts to the state's interest in safeguarding the health of its citizens and the quality of services provided to them. In Rice v. Rehner, supra at 724, the Court stated that "[a] State's regulatory interest will be particularly substantial if the State can point to off-reservation effects that necessitate state intervention." This is particularly true in the instant inquiry where the effects of the treatment received in the health facility will extend far beyond the reservation boundaries. Thus, in balancing the tribal, federal and state interests, it is my opinion that the state's interest in regulating the facility and assuring that the highest quality health care is afforded to its citizens, outweighs the respective tribal and federal interests when the provision of health care to non-Indians is at issue. Although I am of the opinion that Florida's licensing and regulatory laws apply to the proposed facility in providing health care services to non-Indians, the state may not interfere with the Seminole's regulatory control over health care services provided by the facility to their own members. See, White v. Califano, supra. However, I do not perceive that the fact that Indians will also be served by the facility enables the Seminoles to oust state regulatory authority. Rather, under the precedents set forth in United States v. State of Montana, supra; and White Mountain Apache Tribe v. State of Arizona, Department of Game and Fish, supra, both state and Indian regulatory schemes may be applicable.
Recent case law has affirmed the tribal exercise of civil jurisdiction over nonmembers. See, e.g., United States v. Anderson, 736 F.2d 1358, 1364 (9th Cir. 1984), and cases cited therein. And see, Cardin v. De La Cruz, 671 F.2d 363, 366 (9th Cir. 1982), cert. den., 459 U.S. 970 (1982) (Indian tribe retained "inherent sovereign power to impose its building, health, and safety regulations on appellee's business, notwithstanding appellee's ownership in fee of the land on which the [grocery] store stands."). However, to the extent that a conflict exists between the Seminole ordinances and the state statutes regulating health care services to non-Indians, the overriding interest of the state in regulating the health care of its citizens would, in my opinion, prevail. A contrary conclusion would extend the "exercise of tribal power beyond what is necessary to protect tribal self-government or to control internal relations. . . ." See, State of Montana v. United States, 450 U.S. at 564.
In sum, it is my opinion that:
 1) A private, non-Indian corporation seeking to construct a hospital or other health care facility on land held by the United States in trust for the Seminole Indian Tribe, when the facility will be owned and operated by such corporation and will provide care to Indians and non-Indians, must obtain a certificate of need pursuant to s. 381.493, F.S., prior to commencing construction, and
 2) The foregoing hospital or health care facility must be licensed and regulated by the State of Florida pursuant to Ch. 395, F.S., and the rules promulgated thereunder, at least to the extent that such facility provides care to non-Indians.
Sincerely,
Robert A. Butterworth Attorney General
Prepared by: John Rosner
Assistant Attorney General